**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

KENTUCKIANS FOR THE
COMMONWEALTH, INCORPORATED,
                    *Plaintiff-Appellee,*

v.

JOHN RIVENBURGH, Colonel, District
Engineer, U. S. Army Corps of
Engineers, Huntington District;
ROBERT B. FLOWERS, Lieutenant
General, Chief of Engineers and
Commander of the U. S. Army
Corps of Engineers; GINGER
MULLINS, Chief of the Regulatory
Branch, Operations and Readiness
Division, U. S. Army Corps of
Engineers, Huntington District,
                    *Defendants-Appellants,*

and

POCAHONTAS DEVELOPMENT
CORPORATION; HORIZON NR, LLC;
KENTUCKY COAL ASSOCIATION,
                    *Intervenors/Defendants.*

INTERSTATE MINING COMPACT
COMMISSION,
        *Amicus Supporting Appellants.*

No. 02-1736

KENTUCKIANS FOR THE
COMMONWEALTH, INCORPORATED,
                    *Plaintiff-Appellee,*

v.

JOHN RIVENBURGH, Colonel, District
Engineer, U. S. Army Corps of
Engineers, Huntington District;
ROBERT B. FLOWERS, Lieutenant
General, Chief of Engineers and
Commander of the U. S. Army
Corps of Engineers; GINGER
MULLINS, Chief of the Regulatory
Branch, Operations and Readiness
Division, U. S. Army Corps of
Engineers, Huntington District,
                    *Defendants,*

and                                              No. 02-1737

POCAHONTAS DEVELOPMENT
CORPORATION; HORIZON NR, LLC;
KENTUCKY COAL ASSOCIATION,
                    *Intervenors-Defendants-*
                    *Appellants.*

INTERSTATE MINING COMPACT
COMMISSION; NATIONAL MINING
ASSOCIATION; ALABAMA COAL
ASSOCIATION; COAL OPERATORS AND
ASSOCIATES, INCORPORATED; INDIANA
COAL COUNCIL; OHIO COAL
ASSOCIATION; PENNSYLVANIA COAL
ASSOCIATION; VIRGINIA COAL
ASSOCIATION; WEST VIRGINIA COAL
ASSOCIATION; STATE OF VIRGINIA,
                    *Amici Supporting Appellants.*

Appeals from the United States District Court
for the Southern District of West Virginia, at Charleston.
Charles H. Haden II, District Judge.
(CA-01-770-2)

Argued: December 4, 2002

Decided: January 29, 2003

Before NIEMEYER and LUTTIG, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Reversed, vacated, and remanded by published opinion. Judge Niemeyer wrote the opinion, in which Senior Judge Hamilton joined. Judge Luttig wrote an opinion concurring in part and dissenting in part.

## COUNSEL

**ARGUED:** John Thompson Stahr, Environment & Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Robert Gale McLusky, JACKSON & KELLY, P.L.L.C., Charleston, West Virginia, for Appellants. James Millard Hecker, TRIAL LAWYERS FOR PUBLIC JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Thomas L. Sansonetti, Assistant Attorney General, Ellen Durkee, Russell Young, Steve Rusak, Mark Nitczynski, Scott Williams, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Lance D. Wood, Russell Petit, U.S. ARMY CORPS OF ENGINEERS, Washington, D.C.; Steven M. Neugeboren, Office of General Counsel, ENVIRONMENTAL PROTECTION AGENCY, Washington, D.C.; Thomas A. Bovard, Office of the Solicitor, DEPARTMENT OF THE INTERIOR, Washington, D.C., for Federal Appellants. Blair M. Gardner, JACKSON & KELLY, P.L.L.C., Charleston, West Virginia; Michael R. Shebelski, Stephen M. Nickelsburg, HUNTON & WILLIAMS, Richmond, Virginia; Timothy J. Hagerty, Amy D. Cubbage, FROST, BROWN,

TODD, L.L.C., Louisville, Kentucky; Richard J. Bolen, HUDDLES-TON, BOLEN, BEATTY, PORTER & COPEN, Huntington, West Virginia; Robert D. Pollitt, Richard L. Lewis, STEPTOE & JOHN-SON, Charleston, West Virginia, for Appellants Pocahontas, et al. Joseph M. Lovett, APPALACHIAN CENTER FOR THE ECON-OMY AND THE ENVIRONMENT, Lewisburg, West Virginia; Joe F. Childers, Lexington, Kentucky, for Appellee. Christopher B. Power, DINSMORE & SHOHL, L.L.P., Charleston, West Virginia; Gregory E. Conrad, INTERSTATE MINING COMPACT COMMIS-SION, Herndon, Virginia, for Amicus Curiae Commission. Harold P. Quinn, Jr., NATIONAL MINING ASSOCIATION, Washington, D.C., for Amici Curiae Association, et al. Jerry W. Kilgore, Attorney General of Virginia, William H. Hurd, State Solicitor, Judith Williams Jagdmann, Deputy Attorney General, Maureen R. Matsen, Deputy State Solicitor, William E. Thro, Deputy State Solicitor, Roger L. Chaffe, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Amicus Curiae Commonwealth.

---

**OPINION**

NIEMEYER, Circuit Judge:

This appeal presents the issue of whether the U.S. Army Corps of Engineers has authority under the Clean Water Act and under its now-superseded 1977 regulation implementing the Act to issue permits for valley fills in connection with mountaintop coal mining. It does *not* present the question of whether mountaintop coal mining is useful, desirable, or wise.

Kentuckians for the Commonwealth, Inc., a nonprofit corporation formed to promote "social justice and quality of life for all Kentuckians," commenced this action for declaratory and injunctive relief to declare illegal the Corps' interpretation of the Clean Water Act and to require the Corps to revoke the permit that it issued to Martin County Coal Corporation under § 404 of the Act, authorizing Martin Coal to place excess overburden from one of its coal mining projects into 27 valleys in Martin County, Kentucky.

On cross-motions for summary judgment, the district court "found and concluded" that "fill material" as used in § 404 referred only to "material deposited for some beneficial primary purpose," not for waste disposal, and therefore that the Corps' "approval of waste disposal as fill material under § 404 [of the Clean Water Act] [was] *ultra vires*" and "beyond the authority" of the Corps. Because Martin Coal's assignee of the permit, Beech Fork Processing, Inc., proposed "to re-engineer [the] existing mine plan to place no spoil in waters of the United States without a constructive primary purpose," the court found there to be no "imminent probable irreparable injury" to Kentuckians for the Commonwealth. The court determined that in the absence of injury, Kentuckians' application for injunctive relief with regard to the Martin Coal authorization "must be denied." But on the basis of its conclusion that the Corps acts *ultra vires* whenever it issues permits for valley fills without a beneficial primary purpose, the district court entered a purely prospective permanent injunction against the Corps. This injunction prohibits the Corps from "issuing any further § 404 permits within the Huntington District [covering portions of five states] that have no primary purpose or use but the disposal of waste," in particular, any permit to create valley fills with the spoil of mountaintop coal mining for the sole purpose of waste disposal.

Because we conclude that the Corps' practice of issuing § 404 permits, including the permit to Martin Coal, to create valley fills with the spoil of mountaintop coal mining is not *ultra vires* under the Clean Water Act and that the injunction issued by the district court was overbroad, we reverse the court's declaratory judgment; we vacate its injunction and the memorandums and orders of May 8 and June 17, 2002; and we remand for further proceedings not inconsistent with this opinion.

I

Martin County Coal Corporation ("Martin Coal"), having obtained a mining permit from the Commonwealth of Kentucky in November 1999 to undertake a surface mining project in Martin County, Kentucky, applied to the U.S. Army Corps of Engineers ("the Corps") for authorization under § 404 of the Clean Water Act and under the Corps' Nationwide Permit 21 ("NWP 21") "to construct hollow fills

and sediment ponds in waters of the United States" in connection with the proposed mining project. On June 20, 2000, the Corps "authorized" Martin Coal's project, permitting it to place mining-operations "spoil" from "excess overburden" in 27 valleys, filling about 6.3 miles of streams. "Overburden" is the soil and rock that overlies a coal seam, and overburden that is excavated and removed is "spoil." In connection with surface mining operations in mountains where the mine operator must return the mountains to their approximate original contour, the spoil is placed temporarily in valleys while the coal is removed from the seam and then returned to the mining location. However, because spoil takes up more space than did the original overburden, all surface mining creates excess spoil that must be placed somewhere. The permit in this case authorized Martin Coal to create 27 valley fills with the excess spoil, which in turn would bury some 6.3 miles of streams at the heads of the valleys.

The Corps' exercise of authority under NWP 21 to permit the creation of valley fills in connection with mining operations was consistent with its past practices and with the understanding of the Corps and the EPA as to how the Clean Water Act divides responsibility for its administration. While court cases have, over the years, evinced confusion over that division based on the agencies' differing approaches to defining "fill material" in their regulations, *see*, *e.g.*, *Resource Investments, Inc. v. U.S. Army Corps of Eng'rs*, 151 F.3d 1162 (9th Cir. 1998); *Avoyelles Sportsmen's League v. Marsh*, 715 F.2d 897 (5th Cir. 1983), the Corps and the EPA have in fact exercised their authority consistently in interpreting the Clean Water Act to give the Corps authority to issue permits for the creation of valley fills in connection with surface coal mining activities.

At the time that the Corps issued its authorization to Martin Coal in this case, it had already published notice, together with the EPA, of their intent to amend their regulations to resolve ambiguities in both agencies' regulatory definitions of "fill material" and to clarify the division of authority between the two agencies. As the Corps and the EPA stated in the public notice of the intended amendments, issued on April 20, 2000:

> With regard to proposed discharges of coal mining overburden, we believe that the placement of such material into

waters of the U.S. has the effect of fill and therefore, should be regulated under CWA section 404. This approach is consistent with existing practice and the existing EPA definition of the term "fill material." In Appalachia in particular, such discharges typically result in the placement of rock and other material in the heads of valleys, with a sedimentation pond located downstream of this "valley fill." This has required authorization under CWA section 404 for the discharges of fill material into waters of the U.S., including the overburden and coal refuse, as well as the berms, or dams, associated with the sedimentation ponds. The effect of these discharges is to replace portions of a water body with dry land. Therefore, today's proposal makes clear that such material is to be regulated under CWA section 404.

65 Fed. Reg. 21,292, 21,295 (Apr. 20, 2000). This public notice also pointed out that the EPA would, in connection with coal mining activities, continue to regulate "effluent discharged into waters of the U.S. from sedimentation ponds," pursuant to § 402 of the Clean Water Act. *Id.* at 21,296.

In August 2001, Kentuckians for the Commonwealth, Inc. ("Kentuckians"), commenced this action against the Corps under the Administrative Procedure Act ("APA"), challenging the Corps' action in issuing the June 20, 2000 permit to Martin Coal to create 27 valley fills and to bury 6.3 miles of streams. Kentuckians, a nonprofit corporation organized in Kentucky and having a membership of approximately 3,000 members, alleged that it was injured by the issuance of the permit to Martin Coal because its members "visit, live near, drive by and/or fly over areas of the state that are visibly affected by surface coal mining activities, including the area to be affected by [Martin Coal's] proposed mining operations in Martin County, Kentucky." In support of their request for declaratory and injunctive relief, Kentuckians alleged that the Corps had violated § 404 of the Clean Water Act as well as its own regulations and had "acted in a manner that is arbitrary, capricious, an abuse of discretion, and otherwise contrary to law, in violation of the APA, 5 U.S.C. § 706(2)." Kentuckians asked the court to "[d]eclare that Defendants' June 20, 2000 decision granting authorization under NWP 21 to [Martin Coal] is contrary to Section 404 of the CWA and its implementing regulations . . . in violation

of the APA," and to "[i]ssue an order requiring Defendants to revoke [Martin Coal's] authorization under NWP 21 or, in the alternative, to suspend that authorization pending completion of EPA's Section 404(c) proceeding and/or unless and until Defendants comply with their obligations herein under the APA, CWA, and NEPA [National Environmental Policy Act]."

Some months later, after the district court denied the Corps' motion to transfer the case to the Eastern District of Kentucky, it permitted the Kentucky Coal Association, a mining industry trade association, and the Pocahontas Development Corporation, an owner and lessor to Martin Coal of surface and mineral rights, to intervene as defendants in the action. In a later order, the court also granted the motion of AEI Resources, Inc. to intervene as a defendant. Kentuckians then filed a motion for summary judgment, requesting a permanent injunction on Count I of the complaint, and the Corps filed a cross-motion for summary judgment with respect to the same count. Kentuckians argued that under the Clean Water Act and the Corps' regulations, excess overburden placed in the valleys, creating valley fills, was not "fill material" as used in § 404 of the Act. Kentuckians relied primarily on the Corps' 1977 regulation, 33 C.F.R. § 323.2(e) (2001), to argue that valley fills were not "fill material" as defined by the regulation but "waste" as excluded from the Corps' regulation. The Corps' definition of "fill material" was narrower than the EPA's definition, which contained no exclusion for "waste." Kentuckians maintained, therefore, that valley fills created from coal mining activities could only be regulated under § 402 of the Clean Water Act as administered by the EPA, not under § 404 as administered by the Corps. In its cross-motion, the Corps acknowledged that the differing approaches in defining "fill material" employed by EPA and the Corps in their regulations had created some uncertainty about their interpretation of the Clean Water Act but that the consistent practice of both agencies was to interpret the Clean Water Act to authorize the Corps to regulate valley fills in connection with coal mining activities.

On May 3, 2002, while the cross-motions for summary judgment were pending, the Corps and the EPA signed their final joint rule, clarifying the definition of "fill material" to make it both uniform and consistent with their prior practices. The "New Rule," 33 C.F.R. § 323.2 (2002), used an "effects-based" test, defining "fill material"

in § 404 of the Act as any material placed in the waters of the United States that has "the effect of . . . [r]eplacing any portion of a water of the United States with dry land or [c]hanging the bottom elevation." *Id.* § 323.2(e)(1). The New Rule went on to provide that examples of such fill subject to regulation by the Corps included "overburden from mining or other excavation activities," but it also stated that "trash or garbage" was not "fill material." *Id.* § 323.2(e)(2), (3).

A few days later, on May 8, 2002, the district court ruled on the pending cross-motions for summary judgment, concluding that the efforts of the Corps and the EPA, as well as their past applications of § 404, were inconsistent with the Clean Water Act. *Kentuckians for the Commonwealth, Inc. v. Rivenburgh*, 204 F. Supp. 2d 927 (S.D. W. Va. 2002). The court declared that "fill material" as used in § 404 of the Clean Water Act "refers to material deposited for some beneficial primary purpose: for construction work, infrastructure, improvement and development in waters of the United States, not waste material discharged solely to dispose of waste." Accordingly, the court declared that the Corps' "approval of a waste disposal as fill material under § 404 is *ultra vires*, that is, beyond the authority of either [the Corps or the EPA]." The court's order provided:

> the Court FINDS and CONCLUDES § 404 fills may not be permitted solely to dispose of waste. Plaintiff's motion [for summary judgment] is GRANTED. The motions of the Corps Defendants and Defendant-Intervenors are DENIED.

Although the court refused to grant Kentuckians' motion for an injunction requiring the Corps to revoke its permit to Martin Coal because Martin Coal's assignee was prepared to reengineer the project so as not to create valley fills of waste material,[1] it issued a perma-

---

[1]In a letter to the Corps dated June 3, 2002, Beech Fork wrote:

We are filing this new [application] for a new NWP 21 authorization in response to Judge Haden's recent decision, because if our existing NWP 21 authorization is enjoined, Beech Fork must have an alternative plan in place to be able to continue to operate its mine. In this [application], Beech Fork proposes not to place

nent injunction against the Corps prohibiting it from issuing "any further § 404 permits that have no primary purpose or use but the disposal of waste." As the court restated its order, it enjoined the issuance of "mountaintop removal overburden valley fill permits solely for waste disposal under § 404." The court did not, however, strike down the New Rule, as no party had challenged it. But it declared the New Rule to be *ultra vires*:

> These new agency definitions set forth in the final rule are fundamentally inconsistent with the CWA, its history, predecessor statutes, longstanding regulations, and companion statutes. Under the guise of regulatory harmony and consistency, the agencies have taken an ambiguous interpretation, that of the EPA, seized the unsupportable horn of the ambiguity, and now propose to make their original error and administrative practice the law.

---

spoil in jurisdictional waters of the United States, with the exception of ponds.

* * *

Beech Fork believes that if it can continue to operate, it will be able to use adjacent old mining areas to re-engineer its existing mine plan to comply with Judge Haden's interpretation of the law. To this end, Beech Fork obtained an old Penn Coal permit and property, which sits in the middle of the Beech Fork reserve. This old Penn Coal site provides substantial acreage for spoil disposal out of the waters of the United States.

* * *

I would like to emphasize that Beech Fork is not withdrawing its original [application] filed on *April 19, 2000* by Martin County Coal. Indeed, Beech Fork expressly does *not* surrender its current authorization. Beech Fork expressly wishes to be informed before any decision is made concerning the original [application] and NWP 21 with regards to this additional submittal. Obtaining adjacent property for storage disposal, re-engineering the mine, and dealing with the changes in law occasioned by the Judge Haden's recent decision is costing Beech Fork substantial sums of money every day and making it very difficult to operate.

* * *

> Pointedly, the [new] rule is intended to and does allow the massive filling of Appalachian streams with mine waste under auspices of the CWA.

* * *

> The agencies' explanations that regulatory harmony and consistency will result and regulatory practice be maintained are disingenuous and incomplete. The Court does not rule in a vacuum. It is aware of the immense political and economic pressures on the agencies to continue to approve mountaintop removal coal mining valley fills for waste disposal, and to give assurances that future legal challenges to the practice will fail.

* * *

> The agencies' new final rules are inconsistent with the statutory scheme. Thus, the purported rulemaking is *ultra vires*: it exceeds the agencies' statutory authority granted by the CWA.

Following the court's issuance of its memorandum and order on May 8, 2002, the Corps filed a motion for clarification of whether the injunction issued was of nationwide application and whether the district court's declarations invalidated the New Rule, 33 C.F.R. § 323.2 (2002). In its response to the motion, Kentuckians filed a motion for further injunctive relief to require the Corps to "revoke [its] authorization to Martin County Coal Corporation." The district court issued a revised memorandum and order dated June 17, 2002, in which it stated that the injunction did not have nationwide application; rather, it prohibited the Corps from issuing § 404 permits "from their ordinary place of business, the Huntington District," which the court stated would have "substantial national impact" because 97% of "stream length affected by valley fills in the nation" was approved in the Huntington District in 2000. *Kentuckians for the Commonwealth, Inc. v. Rivenburgh*, 206 F. Supp. 2d 782 (S.D. W. Va. 2002). The

court also stated that the injunction did not enjoin the New Rule, 33 C.F.R. § 323.2 (2002). The court repeated, however, its declaration that the New Rule was "inconsistent with the statutory scheme, and therefore *ultra vires*." Finally, the court restated its injunction as modified:

> The Corps Defendants are ENJOINED from issuing any further § 404 permits within the Huntington District that have no primary purpose or use but the disposal of waste, except dredged spoil disposal. In particular, issuance of mountaintop removal overburden valley fill permits solely for waste disposal under § 404 is ENJOINED.

On appeal from the district court's memorandums and orders of May 8 and June 17, 2002, the Corps contends (1) that it has jurisdiction under § 404(a) of the Clean Water Act to regulate as a discharge of "fill material" the disposal into the waters of the United States of excess spoil resulting from the process of surface coal mining, i.e., valley fills, and (2) that, in any event, the district court's injunction was overbroad in enjoining the issuance of any further § 404(a) permits throughout portions of Ohio, West Virginia, Kentucky, Virginia, and North Carolina, where most of the Nation's mountaintop coal mining is conducted. The Intervenors contend that the EPA and the Corps' interpretation of "fill material" under the Clean Water Act was a reasonable one and that the district court erred in substituting its own interpretation for that of the agencies authorized to implement the Act. The Intervenors also contend that the injunction was overbroad, enjoining conduct "that was not the subject of this lawsuit."

## II

We address first the Corps' and the Intervenors' challenge to the breadth of the district court's injunction in the context of this action. The Corps contends that Kentuckians brought this action under the APA, 5 U.S.C. § 706(2)(A), challenging a *specific agency action* as "arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law" — specifically, the Corps' issuance of a permit to Martin Coal. Because this is an APA action challenging a specific agency action, the Corps argues that the injunction issued against it for future permits in a five-state area "far exceeds the relief necessary

to afford Kentuckians full relief in this action." The Corps also argues that the injunction "is contrary to fundamental principles of standing, as Kentuckians has neither alleged nor demonstrated injury-in-fact as to all mining sites in the Huntington District." In a footnote to their brief, the Intervenors join in the Corps' arguments relating to the scope of the injunction.

Kentuckians contends that because it "has Article III standing as to one mine, it can seek relief against the Corps' Huntington District Office to enjoin the same practice at other mines in the same Corps District." It argues that the scope of injunctive relief should be determined by the scope of violation, and in this case the scope involves the Corps' ongoing *ultra vires* actions.

In Count I of the complaint, on which the district court entered summary judgment, the injunctive relief requested by Kentuckians was for the court to order the "Defendants to revoke [Martin Coal's] authorization under NWP 21" or alternatively to suspend authorization pending an EPA review under § 404(c) of the Clean Water Act. The district court did not consider the alternative relief.

In support of the requested relief, Kentuckians submitted affidavits of three members, alleging injury only from the issuance of the permit to Martin Coal. Typically these affidavits state that:

> Highway 3 in Martin County, along Little Beech Fork, adjacent to the mining operation proposed by Martin County Coal Corporation in DSMRE Permit No. 880-0135, is a major route into Martin County from Prestonburg, Lexington and points beyond and as a resident of Martin County, I drive this route frequently. . . . During these drives, I enjoy the undisturbed view of the area proposed to be affected by the mining operation at issue in this case. I enjoy viewing this area in its forested appearance and I would be offended by the deforestation and scarring of the mountains caused by excavation associated with this mining operation as well as by the creation of valley fills and sediment ponds that will occur if this area is stripmined pursuant to the permit at issue in this case.

The affidavits also state typically that the affiants plan to continue driving Highway 3 and that their aesthetic sensibilities will be offended by the proposed mine site. None of the members alleged personal injury resulting from all future permit grants within the five-state area that comprises the Corps' Huntington District, and almost certainly none could have done so. Kentuckians connected their claimed injury to the illegality of the Martin Coal permit, alleging that the defendants' issuance of the permit to Martin Coal "violated the Corps' regulations and section 404 of the Clean Water Act, 33 U.S.C. § 1344."

In acting on Kentuckians' request, the district court refused to issue the injunction commanding the Corps to revoke the permit issued to Martin Coal. On this issue, the court stated:

> Beech Fork recently filed [an application] with the Corps that proposes to re-engineer its existing mine plan to place no spoil in waters of the United States without a construc-tive primary purpose. The initial question a court must ask on an injunction application is whether there is imminent probable irreparable injury to Plaintiff without the injunc-tion and likely harm to the defendant with a decree. [citation omitted] In the absence of injury, the application must be denied. Assuming Beech Fork adheres to its position in the new [application], an injunction is unnecessary. Accord-ingly, the court DENIES Plaintiff's motion without preju-dice to raise it again if altered circumstances necessitate such action.

Nonetheless, based on the court's "findings and conclusions" that § 404 of the Clean Water Act authorizes the Corps to issue permits *only* for discharge of fills for which some beneficial primary purpose exists and not for waste, the district court issued an injunction against the Corps prohibiting it from issuing any future permits in the Hun-tington District absent a finding of beneficial primary purpose. Its injunction reads:

> The Corps Defendants are ENJOINED from issuing any fur-ther § 404 permits within the Huntington District that have no primary purpose or use but the disposal of waste, except

dredged spoil disposal. In particular, issuance of mountain-top removal overburden valley fill permits solely for waste disposal under § 404 is ENJOINED.

It is well established that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). We have explained further that "[a]n injunction should be carefully addressed to the circumstances of the case." *Virginia Soc'y for Human Life v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001) (citing *Hayes v. North State Law Enforcement Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993) ("Although injunctive relief should be designed to grant the full relief needed to remedy the injury to the prevailing party, it should not go beyond the extent of the established violation")).

We conclude that the injunction that the district court issued was far broader than necessary to provide Kentuckians complete relief. The members of Kentuckians are entirely within the Commonwealth of Kentucky and its members alleged injury only in connection with the Martin Coal site for which the permit in this case issued. But, as the district court itself explained, the Huntington District covers portions of five states, and the permits for valley fills in connection with coal mining activities issued by the Huntington District in 2000 alone constituted 97% "of stream length affected by valley fills in the nation." The court acknowledged that "the injunction necessarily will have substantial national impact." It is thus readily apparent that the injury anticipated from future permits is far broader than the scope of injury for which Kentuckians sought relief.

Because we conclude that the injunction issued by the district court was broader in scope than that "necessary to provide complete relief to the plaintiff" and that the injunction did not carefully address only the circumstances of the case, we find it overbroad. Accordingly, we vacate the injunction issued by the district court.

## III

The Corps and the Intervenors also contend that the district court erred as a matter of law in entering summary judgment (1) declaring that "§ 404 fills may not be permitted solely to dispose of waste" and

that "approval of § 404 permits solely for waste disposal are contrary to law and *ultra vires*" and (2) supporting its injunction with that holding.

## A

Before reviewing this issue, it is necessary to separate the district court's holdings that form a part of its judgment from its dicta. In doing this, we begin with the complaint and the parties' cross-motions for summary judgment on Count I of the complaint to determine what issues were fairly presented to the district court for disposition.

The complaint's introduction states that the action was commenced to review "a decision" of the Corps "to authorize [Martin Coal] . . . to fill over six miles of streams in Martin County, Kentucky with waste rock and dirt from surface coal mining activities." And the complaint's general allegations assert that the disposal of waste fill material is contrary to § 404(a) of the Clean Water Act and regulation 33 C.F.R. § 323.2(e) promulgated under it (the "1977 Regulation"). The 1977 Regulation states that § 404 does not authorize the Corps to permit discharges of fill material "primarily to dispose of waste, as that activity is regulated under section 402 of the Clean Water Act," which is managed by the EPA, not the Corps. Count I of the complaint then asserts specifically that "[t]he primary purpose of valley fills associated with surface mining activities is to dispose of waste"; that such fills are subject to regulation under § 402, not § 404, of the Clean Water Act; that the Corps issued a permit to Martin Coal under § 404; and that:

> As a result, Defendants have violated the Corps' regulations and section 404 of the Clean Water Act, 33 U.S.C. § 1344, and have acted in a manner that is arbitrary, capricious, an abuse of discretion, and otherwise contrary to law, in violation of the APA, 5 U.S.C. § 706(2).

The relief sought for Count I is (1) a declaration that the Corps' decision to authorize a permit for Martin Coal is "contrary to Section 404 of the CWA and its implementing regulations, and is arbitrary, capricious, and an abuse of discretion, and otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A)," and (2) an

injunction requiring the Corps "to revoke" the authorization issued to Martin Coal.

The parties' cross-motions for summary judgment were limited to the allegations of Count I and the relief requested in connection with it. The remaining counts of the complaint were not addressed by the motions nor by the district court's order granting a partial summary judgment on Count I.

Addressing Kentuckians' request for declaratory relief, the district court summarized the request as follows:

> [Kentuckians] asks the Court *to find and conclude* the Corps has violated § 404 of the CWA, 33 U.S.C. § 1344, and the Administrative Procedures Act (APA), 5 U.S.C. § 706 (2), because its actions are arbitrary, capricious, an abuse of discretion, and otherwise contrary to law.

(Emphasis added). And summarizing its analysis and holding on this issue, the court stated:

> Section 404 was enacted for the purpose and with the effect of allowing disposal of only one type of pollutant or waste: dredged spoil. Permits for disposal of all other pollutants into national waters are to issue under CWA § 402. "Fill material," as regulated under § 404, refers to material deposited for some beneficial primary purpose: for construction work, infrastructure, improvement and development in waters of the United States, not waste material discharged solely to dispose of waste. Accordingly, approval of waste disposal as fill material under § 404 is *ultra vires*, that is, beyond the authority of either administrative agency, the Corps or Environmental Protection Agency (EPA). To approve disposal of waste other than dredged spoil, in particular mountaintop removal overburden, in waters of the United States under § 404 dredge and fill regulations rewrites the Clean Water Act. Such rewriting exceeds the authority of administrative agencies and requires an act of Congress.

The court also concluded that "[p]ast § 404 permit approvals were issued in express disregard of the Corps' own regulations [the 1977 Regulation]" and were therefore "illegal." The partial summary judgment issued by the district court on May 8, 2002, pursuant to its conclusions provides:

> Accordingly, the court FINDS and CONCLUDES § 404 fills may not be permitted solely to dispose of waste. Plaintiff's motion is GRANTED. The motions of the Corps Defendants and Defendant-Intervenors are DENIED. The Corps Defendants are ENJOINED from issuing any further § 404 permits that have no primary purpose or use but the disposal of waste. In particular, issuance of mountaintop removal overburden valley fill permits solely for waste disposal under § 404 is ENJOINED.

In short, the court's order (1) declares permits authorizing fills of excess overburden to be illegal in the absence of a beneficial primary purpose and (2) enjoins all future permits that authorize fills having no primary purpose or use but the disposal of waste.

To support its declaration that § 404 fills may not be permitted solely to dispose of waste, the court interpreted § 404 and the 1977 Regulation to have a consistent meaning. And to support its injunction, the court gratuitously addressed the New Rule, 33 C.F.R. § 323.2 (2002), stating:

> The agencies' attempt to legalize their long-standing illegal regulatory practice must fail. The practice is contrary to law, not because the agencies said so, although their longstanding regulations correctly forbade it. The regulators' practice is illegal because it is contrary to the spirit and the letter of the Clean Water Act.

Based on this conclusion, the district court prohibited the Corps from issuing future permits, even though they would be justified by the New Rule.

When the Corps filed a motion for clarification of the permanent injunction and Kentuckians renewed its request for the particularized

injunction involving Martin Coal, the district court modified the injunctive relief on June 17, 2002, but in doing so, it did not alter or modify the declaratory judgment entered on May 8, 2002.

While we have already indicated that we are vacating this injunction for overbreadth, it is also subject to being vacated as reaching beyond the issues presented to the district court for resolution. None of the parties sought a declaration that the New Rule was illegal or inconsistent with the Clean Water Act. Indeed, the New Rule was not promulgated until May 3, 2002, a few days before the district court issued its injunction on May 8, 2002.

Thus, we are fairly presented for review the district court's declaration that valley fills authorized by the Corps in its permit to Martin Coal are contrary to § 404 and to the 1977 Regulation, as the district court interpreted that rule. We are *not* presented with the question of whether the New Rule is inconsistent with § 404. Because the district court reached beyond the issues presented to it in deciding that issue, we vacate its ruling declaring the New Rule to be inconsistent with § 404 of the Clean Water Act.

The judgment of the district court, as contained in its two orders of May 8 and June 17, 2002, and the positions of the parties thus bring us to the single question whether § 404 of the Clean Water Act, in providing that the Corps "may issue permits . . . for the discharge of dredged or fill material into navigable waters," authorizes the Corps to issue permits for the creation of valley fills in connection with coal mining activities, when the valley fills serve no purpose other than to dispose of excess overburden from the mining activity. This question is presented particularly in Kentuckians' challenge of the Corps' action in issuing the permit to Martin Coal.

B

When reviewing a particular agency action challenged under § 706(2) of the APA, "[t]he court is first required to decide whether the [agency] acted within the scope of [its] authority." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). The first step in this analysis is an examination of the statute providing

authority for the agency to act. As the Supreme Court explained in *NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257 (1995):

> [W]hen we confront an expert administrator's statutory exposition, we inquire first whether "the intent of Congress is clear" as to "the precise question at issue." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984). If so, "that is the end of the matter" *Ibid*. But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. If the administrator's reading fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design, we give the administrator's judgment "controlling weight." *Id.* at 844.

This analytical approach applies not only when a *regulation* is directly challenged, as in *Chevron*, but also when a particular agency *action* is challenged, as in *NationsBank*.

Moreover, when an agency acts pursuant to a regulation, a reviewing court must, if there is any dispute about the meaning of the regulation, interpret the meaning of the regulation to determine whether the agency's action is consistent with the regulation. The reviewing court does not have much leeway in undertaking this interpretation, however, because the agency is entitled to interpret its own regulation and the agency's interpretation is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotation marks and citation omitted). This requirement of binding deference to agency interpretations of their own regulations, unless "plainly erroneous or inconsistent with the regulation," is known as *Seminole Rock* deference, having first been articulated in *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945).

Finally, if there is any question whether an agency action taken pursuant to a regulation exceeds the agency's statutory authority, the statutory inquiry under *Chevron* step one (whether the intent of Congress is clear) must take place prior to interpreting the agency's own regulation. This ordering is a function of the *Chevron* test itself: If

Congress has spoken clearly to the issue, then the regulation is inapplicable. *See Chevron U.S.A. Inc. v. Echazabal*, 122 S. Ct. 2045 (2002) (applying an analytical approach by which the validity of an action taken in reliance a regulation depends, in the first instance, on whether the regulation itself exceeds the issuing agency's statutory authority); *see also* John F. Manning, *Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules*, 96 Colum. L. Rev. 612, 627 n. 78 (1996) ("It is important to note that because a regulation must be consistent with the statute it implements, any interpretation of a regulation naturally must accord with the statute as well. . . . [T]o get to *Seminole Rock* deference, a court must first address the straightforward *Chevron* question whether an agency regulation, as interpreted, violates the statute. *Seminole Rock* addresses the further question whether the agency's interpretation is consistent with the regulation").

C

In this case the Corps contends that "[t]he district court erred as a matter of law in holding that the Corps lacks authority under CWA Section 404 to regulate as 'fill material' the discharge of excess spoil from surface coal mining into waters of the United States."[2] It notes

---

[2]In asserting that it is not only unnecessary but also "treacherous" to reach the statutory issue raised in the complaint and decided upon by the district court, our concurring colleague apparently assumes that the agency acted within the scope of its statutory authority. Because the plaintiffs alleged, and the district court decided, that the Corps acted beyond the scope of its statutory authority, we first address this issue. Count I of Kentuckians' complaint alleged that "Defendants have violated the Corps' regulation *and section 404 of the Clean Water Act*" (emphasis added). The district court decided that "[p]ast § 404 permit approvals were issued in express disregard of the Corps' own regulations and the CWA." Moreover, the very first sentence of the concurring opinion states that Kentuckians claimed "that the Corps violated its 1977 regulations *and section 404 of the Clean Water Act* in issuing" the Martin Coal permit (emphasis added). Yet based on statements made by counsel at oral argument rather than on the issues raised in the complaint, decided by the district court, and presented on appeal, our colleague asserts that "there was no need for the district court (and there is likewise

that Congress did not define "fill material" and left that to the agencies charged with administering § 404. It concludes that the practice followed by it and by the EPA over the years is "a permissible one entitled to deference" under *Chevron*. It claims that the new dual-agency construction in the New Rule reflects the agencies' past practices and "falls easily within the most obvious reading of the term 'fill material,'" and is consistent with the statutory scheme and purposes of the Clean Water Act.

The Intervenors similarly conclude that the term "fill material" was not defined by Congress in the Clean Water Act and that the district court erred "in not deferring to EPA's and the Corps' 'effects' definition of 'fill material,'" which is a reasonable construction of the statutory term.

Kentuckians contends that "[t]he district court correctly held that the Corps lacks authority under § 404 of the Clean Water Act to allow the filling of waters of the United States solely for waste disposal," but Kentuckians asserts that it "reaches that conclusion on grounds that differ, in part, from those relied on by the district court." Although Kentuckians agrees that "fill material" has not been defined in the Clean Water Act, it argues that Congress' intent is clear from the context of the Clean Water Act and that Congress did not mean for any provision of the Act to permit the Corps to "*evade* the water quality standards" mandated by the Act. Kentuckians asserts that to construe "fill material" in any way other than that given by the district court would violate the clear intent of the Clean Water Act "to restore and maintain the chemical, physical and biological integrity of the nation's waters." 33 U.S.C. § 1251(a). Kentuckians contends alternatively that even if the Act is ambiguous, the Corps' interpretation is unreasonable and impermissible because "[e]vasion of a statute's core mandate and purpose can scarcely be considered a 'reasonable' inter-

_____

no need for this court) to interpret the Clean Water Act . . . ." *Compare Thomasson v. Perry*, 80 F.3d 915, 935 (4th Cir. 1996) (Luttig, J., concurring) (acknowledging the position of both parties that "the question of the validity of the regulation is not before us," and asserting nonetheless that "I would simply invalidate the Administration's regulation as in excess of its statutory authority").

pretation." Finally, Kentuckians asserts that the Corps' interpretation is internally inconsistent because the Corps' construction gives it authority over "mining waste, but excludes trash and garbage." It argues that such a construction produces an absurd result because the burial of a stream by mining waste is "much more devastating" than degradation of water by trash or garbage.

As with any issue of statutory interpretation, we begin with the language of the statute. If congressional intent is clear from application of "traditional tools of statutory construction," *Brown & Williamson Tobacco Corp. v. FDA*, 153 F.3d 155, 161 (4th Cir. 1998), *aff'd*, 529 U.S. 120 (2000), "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress," *Chevron*, 467 U.S. at 842-43. "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

Because the Clean Water Act does not define "fill material," nor does it suggest on its face the limitation of "fill material" found by the district court, the statute is silent on the issue before us, and such silence "normally creates ambiguity. It does not resolve it." *Barnhart v. Walton*, 122 S. Ct. 1265, 1270 (2002); *see also Piney Run Preservation Ass'n v. County Comm'rs*, 268 F.3d 255, 267 (4th Cir. 2001) (holding that while a Clean Water Act permit provision "makes clear that compliance with a permit constitutes an exception to the general strict liability of the CWA," that provision is ambiguous because it "does not explicitly explain the scope of permit protection").

The district court concluded, however, that its facial interpretation — that a permit issued under § 404 can only authorize the discharge of fill material into navigable waters "for some beneficial primary purpose . . . not waste material discharged solely to dispose of waste" — was supported by § 404(f)(2) of the Clean Water Act, by the Act's succession to the Rivers and Harbors Act, and by the Act's relation to the Surface Mining Control and Reclamation Act ("SMCRA"). We examine each of these to determine whether any unambiguously indicates a clear congressional intent with respect to the definition of "fill material" as used in § 404(a).

Explaining its reliance on § 404(f)(2) of the Act, the court stated:

> While the specific term "fill material" is not defined by statute, the CWA is not silent about the types of fills requiring § 404 permits. *See Kentuckians*, 2002 WL 1033853 at *7; 33 U.S.C. § 1344(f)(2) [§ 404(f)(2) of the Act] (fills "incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject" require permits). Thus § 404 is neither silent nor ambiguous on the issue of § 404 fills and their purposes.

A closer examination of § 404(f)(2), however, does not provide evidence of clear intent that "fill material" means only "material deposited for some beneficial primary purpose." This is because § 404(f)(2) does not define or limit "fill material." Rather, it serves only as a narrow restoration of permit coverage to the list of discharges exempted from permit coverage in § 404(f)(1), and the list of discharges in § 404(f)(1) is a short list of exceptions to the broad range of discharges covered by the term "fill material" in § 404(a). Thus, § 404 (f)(2) is no more than a single exception to the list of exceptions to the broad coverage of § 404(a). At most, the exception of § 404(f)(2) to the exceptions provided in § 404(f)(1) describes one possible circumstance in which a permit is required, but it does not limit the breadth of discharges subject to permit authority in § 404(a).

The district court also relied on the Clean Water Act's succession to the Rivers and Harbors Act to derive a clear congressional intent to enact the beneficial-primary-purpose meaning of "fill material." The district court concluded that Congress intended that § 404 of the Clean Water Act would carry forward only the Corps' authority under § 10 of the River and Harbors Act, 33 U.S.C. § 403, and that § 402 of the Clean Water Act would carry forward the activities previously covered by § 13 of the Rivers and Harbors Act, often referred to as the Refuse Act, 33 U.S.C. § 407. The court concluded that these two provisions of the Rivers and Harbors Act bifurcated the regulation of activities, with § 10 of the Rivers and Harbors Act regulating only the construction of *beneficial* projects and § 13 regulating all *waste* disposal other than dredged spoil. The court concluded that §§ 402 and 404 of the Clean Water Act "perpetuated that longstanding distinction." While the court may have been correct that § 10 of the Rivers

and Harbors Act was one source of § 404 of the Clean Water Act, it erred in concluding that § 10 regulated only beneficial fills, not waste. On its face, § 10 of the Rivers and Harbors Act is sufficiently broad to prohibit the discharge of any fill material, including waste, that would "alter or modify the course, location, *condition*, or capacity" of designated navigable waters. 33 U.S.C. § 403 (emphasis added). And the regulations adopted under § 10 implement regulation of any plans for "*excavation or fill in navigable waters*." 33 C.F.R. § 209.120(b)(1)(i)(b) (1973) (emphasis added). Moreover, the Supreme Court has recognized that § 10 of the Rivers and Harbors Act is not so limited as to exclude the deposit of *industrial waste* containing various solids which, upon settling out, reduced the depth of a river. *United States v. Republic Steel Corp.*, 362 U.S. 482 (1960); *see also Sierra Club v. Andrus*, 610 F.2d 581, 596-97 (9th Cir. 1979). The district court could not conclude, therefore, that even if § 404 of the Clean Water Act succeeded only § 10 of the Rivers and Harbors Act, the provisions of § 10 would limit the definition of "fill material" in § 404 to "material deposited for some beneficial primary purpose."

Similarly, the Clean Water Act's relationship to SMCRA does not provide a clear intent that § 404's definition of "fill material" is limited to a beneficial use. While SMCRA does not define "fill material," its term "excess spoil material," 30 U.S.C. § 1265(b)(22), is defined in the SMCRA regulations as material placed "in a location other than the mined-out area." 30 C.F.R. § 701.5 and 816/817.71-.74. And, regardless of whether the fill has a beneficial primary purpose, SMCRA does not prohibit the discharge of surface coal mining excess spoil in waters of the United States. The district court's reference to SMCRA's provision of a "buffer zone," *see* 30 C.F.R. § 816.57, does not address the scope of the Corps' jurisdiction under the Clean Water Act to regulate all "fill material." Indeed, it is beyond dispute that SMCRA recognizes the possibility of placing *excess spoil* material in waters of the United States even though those materials do not have a beneficial purpose. Section 515(b)(22)(D) of SMCRA authorizes mine operators to place excess spoil material in "springs, natural water courses or wet weather seeps" so long as "lateral drains are constructed from the wet areas to the main underdrains in such a manner that filtration of the water into the spoil pile will be prevented." 30 U.S.C. § 1265(b)(22)(D). In addition, § 515(b)(24) requires surface mine operators to "minimize disturbances and adverse impacts of the

operation on fish, wildlife, and related environmental values, and achieve enhancement of such resources where practicable," implying the placement of fill in the waters of the United States. 30 U.S.C. § 1265(b)(24). It is apparent that SMCRA anticipates the possibility that excess spoil material could and would be placed in waters of the United States, and this fact cannot be juxtaposed with § 404 of the Clean Water Act to provide a clear intent to limit the term "fill material" to material deposited for a beneficial primary purpose.

The district court also resorted to the legislative history of the Clean Water Act, but this history does not demonstrate a clear congressional intent to limit "fill material" to material deposited for a beneficial primary purpose. The court's canvass of statements by legislators concludes merely that the sole concern of Section 404 was dredged spoil, and "Section 404 was enacted to allow harbor dredging and dredged spoil disposal to continue expeditiously under the then-existing dredge and fill permit program administered by the Corps." The focus of the court's description of the legislative history is only on dredged spoil, not on the meaning of the additional term "fill material," on which the legislative history appears inconclusive.

Finally, the district court relied on "longstanding regulatory interpretation" by the EPA and the Corps. This reliance was entirely inappropriate to the court's analysis under *Chevron* step one. The focus of step one of *Chevron* analysis is "whether *Congress* has directly spoken to the precise question at issue," making its intent clear. *Chevron*, 467 U.S. at 842 (emphasis added). Agency interpretations of statutory provisions only come into play if Congress has not spoken clearly. Relying on *agency* interpretations as evidence of a clear *congressional* intent is therefore misguided.

The district court's application of traditional tools of statutory construction thus could not leave it with a clear congressional intent that the undefined term "fill material" as used in § 404 means material deposited for a beneficial primary purpose. Indeed, the lack of clarity in the term itself prompted the agencies to undertake efforts to develop the term's meaning from the context of the permit programs and the interrelationship between § 402 permits and § 404 permits. While the statute authorizes the EPA to issue permits "for the discharge of any pollutant," defining "pollutant" to include "rock, sand,

cellar dirt and industrial, municipal, and agricultural waste," 33 U.S.C. § 1362(6), the EPA is not authorized to issue a permit for "fill material," 33 U.S.C. § 1342(a)(1). Yet, when a permit is issued by the Corps under § 404 for the discharge of fill material that has a substantive adverse effect on municipal waters, fish, and wildlife, the EPA can veto the Corps' permit. 33 U.S.C. § 1344(c). The statute's silence on the definition of "fill material" thus gives rise to ambiguity, particularly when a broad definition of "fill material" is employed.

Based on our *de novo* review of whether Congress has spoken clearly on the meaning of "fill material," *see Holland v. Pardee Coal Co.*, 269 F.3d 424, 430 (4th Cir. 2001) (holding that an issue of statutory construction is a "pure question of law" subject to *de novo* review), we conclude that Congress has not clearly spoken on the meaning of "fill material" and, in particular, has not clearly defined "fill material to be material deposited for some beneficial primary purpose." Accordingly, we proceed into *Chevron* step-two analysis to determine whether the Corps' action is based on a permissible construction of § 404. *See Capitol Mortgage Bankers, Inc. v. Cuomo*, 222 F.3d 151, 155 (4th Cir. 2000) (determining that the district court's *Chevron* step-one holding was incorrect and stating that "[w]e must therefore proceed to the second step of the *Chevron* analysis and consider, with deference to [the agency's] expertise in this area, whether the agency's interpretation of the statute . . . is based on a permissible construction of the statute").

### D

Although the district court rested its holding principally on a statutory interpretation of the Clean Water Act under *Chevron* step one, concluding that "§ 404 is neither silent nor ambiguous on the issue of § 404 fills and their purposes," it addressed alternatively, albeit conclusorily, the reasonableness of the Corps' interpretation of the statute under *Chevron* step two. The court stated that its "examination of the legislative and regulatory history, interagency agreements, and related statutes demonstrates any interpretation of § 404 fill material that ignores and deliberately eliminates the primary purpose test for fill authorization is contrary to the purpose, principles, and policy of the CWA. [Citation omitted]. Such an agency interpretation is not permissible." The court thus reiterated the conclusion it reached in its

*Chevron* step-one analysis, and its *Chevron* step-two analysis did not give any deference to the agency's interpretation of this regulation nor did it explain why such deference would be inappropriate.

Because the agency action at issue in this case was taken at a time when the Corps' 1977 Regulation was in effect, the appropriate inquiry under *Chevron* step two is whether that regulation, as interpreted by the Corps, is based on a permissible reading of the Clean Water Act, and, if so, whether the agency acted consistently with the regulation in issuing a permit to Mountain Coal to create valley fills in connection with coal mining activities.

The Corps' 1977 Regulation defines "fill material" as "any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a [ ] waterbody." 33 C.F.R. § 323.2(e) (2001). The regulation provides further that "[t]he term does not include any pollutant discharged into the water primarily to dispose of waste, as that activity is regulated under section 402 of the Clean Water Act." *Id.* At the time when this 1977 Regulation was promulgated, the Corps, explaining the "waste" exclusion, stated that in its experience:

> several industrial and municipal discharges of solid waste materials have been brought to our attention which technically fit within our definition of "fill material" but which are intended to be regulated under the NPDES program [i.e., the EPA's program created under § 402]. These include the disposal of waste materials such as sludge, garbage, trash, and debris in water.

> * * *

> The Corps and the Environmental Protection Agency feel that the initial decision relating to this type of discharge should be through the NPDES program.

42 Fed. Reg. 37,122, 37,130 (July 19, 1977).

To demonstrate that the Corps' understanding of its authority to issue permits for valley fills was based on a longstanding division of

authority between the Corps and the EPA that reflected the interpretations of both agencies with regard to their respective regulatory authority under the Clean Water Act, the Corps submitted to the district court over 120 pages of correspondence with the EPA and with regulated parties addressing valley fill permits issued under Section 404. This correspondence, which spans approximately ten years from 1990 through 2000, includes actual permit grants, EPA objections to Corps actions, and evaluations by the Corps and the EPA of mitigation plans. To the extent that this correspondence reveals any disputes about the Corps' exercise of its permitting authority, these disputes focus on whether the impact of a particular valley fill would be more than minimal, thus requiring the issuance of an individual permit rather than authorization under a nationwide permit. The basic division of authority, including the Corps' authority to issue valley fill permits, is apparent throughout this record of both agencies' practices. The Corps also submitted the affidavit of Michael B. Cook, the director of EPA's Office of Wastewater Management in Washington, D.C. since 1991. According to Mr. Cook:

> While the effluent guidelines address certain discharges of pollutants associated with coal mining operations (e.g., coal preparation plants and mine drainage), the regulations do not address discharges of soil, rock and vegetation (i.e., overburden) that is excavated in order to access coal reserves and then placed in waters of the United States, as in the case of valley fills. To our knowledge, such discharges have only been authorized by permits issued under section 404 of the CWA by the Army Corps of Engineers.

In short, the evidence submitted to the district court revealed a long-standing and consistent division of authority between the Corps and the EPA with regard to the issuance of permits under CWA Section 402 and CWA Section 404.

Moreover, when the Corps issued the permit to Martin Coal on June 20, 2000, it continued to operate with an understanding that it was authorized to regulate discharges of fill, even for waste, unless the fill amounted to effluent that could be subjected to effluent limitations. It certainly did not interpret its own 1977 Regulation to impose a beneficial primary purpose requirement. This is evidenced by its

public notice given on April 17, 2000, two months *prior* to the issuance of the permit at issue in this action, when the Corps joined with the EPA to propose a joint rule that would "not alter current practice," but rather was "intended to clarify what constitutes 'fill material' subject to CWA section 404." 65 Fed. Reg. at 21,292. The Corps and the EPA recognized that some courts had interpreted the Corps' regulation to impose a primary-purpose test applied without regard to the traditional division of authority between the Corps and the EPA, and that the ambiguities of this test had caused confusion. As one specific example of this confusion, the Corps and the EPA pointed to dicta in an opinion issued by the district court in an earlier valley-fill case in which the district court determined that "the Corps lacked authority to regulate under CWA section 404 the placement into waters of the U.S. of rock, sand, and earth overburden from coal surface mining operations, because the 'primary purpose' of the discharge was waste disposal." *Id.* at 21,295. Disclaiming any interpretation of the Corps' 1977 Regulation that would strip the Corps of authority to issue § 404 permits for valley fills, the Corps and the EPA described what they understood the appropriate division of labor to be:

> The section 402 program is focused on (although not limited to) discharges such as wastewater discharges from industrial operations and sewage treatment plants, stormwater and the like. . . . Pollutant discharges are controlled under the section 402 program principally through the imposition of effluent limitations, which are restrictions on the "quantities, rates, and concentrations of chemical, physical, biological and other constituents which are discharged from point sources into navigable waters" . . . . There are no statutory or regulatory provisions under the section 402 program designed to address discharges that convert waters of the U.S. to dry land.

* * *

> [S]ection 404 focuses exclusively on two materials: dredged material and fill material. The term "fill material" clearly contemplates material that fills in a water body, and thereby converts it to dry land or changes the bottom elevation. Fill material differs fundamentally from the types of pollutants

covered by section 402 because the principal environmental concern is the loss of a portion of the water body itself. For this reason, the section 404 permitting process focuses on different considerations than the section 402 permitting program.

*Id.* at 21,293.

This contemporaneous explanation by the two agencies charged with the responsibility of administering the Clean Water Act provides a rational interpretation of the 1977 Regulation that is neither plainly erroneous nor inconsistent with the text of the regulation. The 1977 Regulation seeks to divide the statutory responsibilities between the agencies charged with different responsibilities by defining "fill material" that is subject to regulation by the Corps and "waste" that is subject to regulation by the EPA through the administration of effluent limitations. Moreover, the resolution among agencies of the line dividing their responsibilities is just the type of agency action to which the courts must defer. *See Echazabal*, 122 S. Ct. at 2052 (noting that the EEOC's resolution of a tension between the Americans with Disabilities Act and the Occupational Safety and Health Act "exemplifies the substantive choices that agencies are expected to make when Congress leaves the intersection of competing objectives both imprecisely marked and subject to administrative leeway").[3]

---

[3]In the concurring opinion, our colleague suggests that the record of this litigation contains "neither an interpretation nor competent evidence of the Corps' interpretation" of the 1977 regulations. Rather, our colleague suggests, we only know what the Corps' practice has been. Apart from overlooking the Corps' 1977 and 2000 statements in the Federal Register, which state its interpretation of the 1977 Regulation, our colleague's distinction between interpretation and practice in this context neglects an additional approach which the record bears out, namely that the Corps' regulatory practice reflects its interpretation. *Cf. Udall v. Tallman*, 380 U.S. 1, 18 (1965) (explaining that an administrative interpretation of two Executive Orders had "long . . . been a matter of public record and discussion" and applying the "rule that the practical construction given to an act of Congress, fairly susceptible of different constructions, by those charged with the duty of executing it is entitled to great respect and, if acted upon for a number of years will not be disturbed except for cogent reasons") (quotation marks omitted).

A reviewing court can set aside the agency's interpretation of its own regulation only if that interpretation is "plainly erroneous or inconsistent with the regulation." *Auer*, 519 U.S. at 461 (internal quotation marks and citation omitted). When we examine the Corps' 1977 Regulation and its interpretations of that regulation, we conclude that the Corps' interpretations of the 1977 Regulation — made both by interpretations published in the Federal Register and by its application of that regulation in issuing permits — were neither plainly erroneous nor inconsistent with the text of the regulation.

We next determine whether the 1977 Regulation itself, as construed by both the Corps and the EPA, was also a permissible reading of the Clean Water Act.

The stated goal of the Clean Water Act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To that end, the Clean Water Act prohibits discharges of pollutants into the waters of the United States, except in compliance with a permit issued by one of the permit regimes established by the Act. 33 U.S.C. § 1311(a). Two principal regimes are created in §§ 402 and 404 of the Act. Section 402 creates a permit program under the National Pollutant Discharge Elimination System, a combination of State and EPA regulatory activities that is administered by the EPA. Section 404 creates a permit program administered by the Corps, authorizing the Corps to issue permits only in connection with the "discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). The two sections are linked by cross-references, exclusions, and vetoes. Section 402 authorizes the EPA to issue permits for the discharge of any pollutant or combination of pollutants, except as provided in § 404. And § 404 in turn provides that the Corps may issue permits for the limited discharges relating to dredged or fill material, providing that the Corps' permits are always subject to the veto power of the EPA when the dredged or fill material would have "an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas . . . wildlife, or recreational areas." 33 U.S.C. § 1344(c). Thus, a § 404 permit is always subject to the EPA's determination that a discharge will have an "unacceptable adverse effect" on certain specified waters, reinforcing the fill-effluent distinction that has been followed by the agencies.

Because the Clean Water Act clearly intended to divide functions between the Corps and the EPA based on the type of discharge involved, we conclude that it was consistent with the Act for the Corps to have adopted its 1977 Regulation defining "fill material" to be

> any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a [ ] water body. The term does not include any pollutant discharged into the water primarily to dispose of waste, as that activity is regulated under Section 402 of the Clean Water Act.

33 C.F.R. § 323.2(e) (2001). The first sentence of this regulation adopts an inclusive test that focuses on the purposeful displacement of water with solid material. The second sentence provides, as construed by the agencies, an exclusion which defers to the EPA's authority to regulate "waste." Because it was not plainly erroneous or inconsistent with the regulation for the Corps to have asserted that its use of the term "waste" in the 1977 Regulation was not intended to defer to the EPA on all material deposited for disposal, as we have already concluded, we read the 1977 Regulation to include that interpretation and, as so interpreted, conclude that the 1977 Regulation was a rational interpretation of the Clean Water Act. Section 404 confers on the Corps all responsibility to issue permits for the discharges of "fill material," but it gives the EPA a veto when those discharges might adversely affect the quality of certain waters. Section 402 confers on the EPA responsibility to regulate the discharge of pollutants into waters under mechanisms to administer effluent limitations. The two authorizations might overlap on certain types of "fill material" that adversely affect the quality of water, and the 1977 Regulation, as interpreted by the Corps, reasonably addresses this potential ambiguity.

In sum, we conclude that the Corps' interpretation of "fill material" as used in § 404 of the Clean Water Act to mean all material that displaces water or changes the bottom elevation of a water body except for "waste" — meaning garbage, sewage, and effluent that could be regulated by ongoing effluent limitations as described in § 402 — is a permissible construction of § 404. And as an interpretation of its

1977 Regulation, it is neither plainly erroneous nor inconsistent with the text of the regulation.

The Corps' issuance of the permit to Martin Coal on June 20, 2000, therefore, was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law insofar as Kentuckians alleged in Count I of the complaint. On this issue, we reverse the judgment of the district court.

IV

In sum, we vacate the injunction issued by the district court on May 8, 2002, as modified on June 17, 2002; we reverse the district court's declarations that "fill material" as used in § 404 of the Clean Water Act is limited to mean "material deposited for some beneficial primary purpose . . ., not waste material discharged solely to dispose of waste" and that the Corps has acted *ultra vires* in issuing valley fill permits, particularly the authorization to Martin Coal in this case; we vacate the district court's memorandums and orders of May 8 and June 17, 2002; and we remand for further proceedings not inconsistent with this opinion.

*IT IS SO ORDERED*

LUTTIG, Circuit Judge, concurring in the judgment in part and dissenting in part:

The Kentuckians, the plaintiff in this litigation, challenged a single fill deposit permit issued by the defendant Corps of Engineers to a single company, Martin Coal, and it claimed only that the Corps violated its 1977 regulations and section 404 of the Clean Water Act in issuing that one permit. The plaintiff sought a declaration that the Martin Coal permit was unlawful under the 1977 regulations and an injunction prohibiting deposits pursuant to that permit. The only issue before the district court, therefore, was whether the permit issued to Martin Coal was lawfully issued under the Corps' 1977 regulations which were then in effect.

Notwithstanding that this was the issue, and only issue, presented by the Kentuckians' complaint, the district court never even addressed

this issue. And not only did it not address this narrow presented issue; it wrote expansively on a wide range of other issues not presented by the plaintiff at all, including the meaning of section 404 of the Clean Water Act, and the validity, not even of the 1977 regulations pursuant to which the challenged permit was issued, but of the new regulations jointly issued by the Corps and EPA in 2002, which regulations have no relevance of any kind whatsoever to the instant litigation. To add insult to injury, after addressing itself broadly to, and deciding, these issues that were not even presented by the complaint, the district court proceeded to issue a *prospective* injunction based upon these roving interpretations, which effectively prohibited the Corps from issuing any permits *in futuro* for mountaintop removal mining in parts of five different states. Finally, completing its utterly bewildering treatment of this relatively straightforward case, the district court refused to enjoin the deposits authorized under the one permit that the Kentuckians actually did challenge, although it obviously believed those deposits unlawful.

It misses the mark to say, as the majority does, that the district court's injunction was "overbroad." Such an assessment implies that at least a part of the injunction was legitimate. But no part of the district court's injunction was directed to the controversy presented by the plaintiff, and therefore none of the injunction was legitimate. Indeed, at oral argument, even counsel for the Kentuckians freely admitted that the district court's actions bore no relation whatsoever to the relief requested:

> *COURT*: It seems . . . that the district court here had the simplest and narrowest of cases before it and in the end that's what troubled the court. It was not content with deciding the issue before it. It was told during the progression of the proceedings that there was a new rule and the court wanted to reach out and grab that rule and invalidate it. And the only way to do that was to go to the Clean Water Act straight ahead rather than to the existing regulation by the Corps. Because, as the district court said, it believed that regulation was just fine. But if it agreed that that regulation was fine, then all that it would be left to do is decide whether the permit issued under it was valid or not, which is a relatively menial exercise compared to invalidation, prospectively, of

all regulations in all jurisdictions based upon an overarching interpretation of the Clean Water Act. But it seems that that's exactly what happened here.

COUNSEL FOR KENTUCKIANS: That's correct.

Oral Argument, Dec. 4, 2002.

As if pleased with the district court's *ex cathedra* decision, the parties briefed the appeal as if all of the issues decided by the district court not only were raised by the complaint but properly decided by that court. Thus, the Kentuckians argue fervently that the district court's interpretation of the Clean Water Act is correct, and the Corps and Intervenors argue just as ardently that the 2002 regulations are a permissible interpretation of that Act. And like the district court, all of these parties ignore entirely the sole issue actually presented for review in this case.

The role of the appellate court in theory, of course, is to right the legal wrongs that occur in the district courts and, in the course of so doing, to explain to the parties the error in the arguments they advance in defense of and challenge to the district court's judgment. But rather than right the palpable wrongs of the district court, and explain to the parties wherein their errors lie, the majority instead adds to those wrongs by proceeding precisely as did the district court, and as do the parties, simply reaching different conclusions from those reached by the district court, and aligning itself with one side to the litigation rather than the other. Thus, just as the district court was not content simply to address the issue presented to it, so also is the majority discontent to address only the issue presented to us. Repeating in reverse the errors committed by the district court, the majority wades knee-deep, and without apparent hesitation, into the very issues that were improvidently decided by the district court and argued by the parties (and more), concluding, among other things, (1) that the meaning of the term "fill material" in section 404 of the Clean Water Act is ambiguous under *Chevron* step one, (2) that the Corps' interpretation of its 1977 regulation is neither plainly erroneous nor inconsistent with the text of the 1977 regulation, (3) that so construed, the 1977 regulation is a permissible interpretation of the Clean Water Act under *Chevron* step two, and, last but not least, (4) that the issu-

ance of the Martin Coal permit by the Corps was not arbitrary and capricious. Of these issues decided by the majority, only the first was actually passed upon by the district court, and, as noted, it improperly so.

Proceeding *ex cathedra* in this fashion, the majority, as might be expected, falls headlong into the very pitfalls that are generally avoided by simple adherence to the prudential rule against decision of issues not presented. To take one, but one exceedingly important, example, the majority concludes confidently, at the heart of its opinion, that it must defer to the Corps' interpretation of the Corps' 1977 regulations. But the Corps has not provided this court with any interpretation of the 1977 regulations, for the understandable (even if, at this point, comic) reason that the district court did not hold as to the interpretation of these regulations or the lawfulness of the Martin Coal permit under these regulations, and thus there is no judgment on this issue from which to appeal and on the basis of which to marshal argument.

When asked by the court at oral argument whether there was "any substantive difference between the new rule [the 2002 regulations] and the old rule [the 1977 regulations]," counsel for the Corps did reply, "there is a word difference *and a substantive difference*. The prior rule says that material deposited just for waste should be regulated under section 402 of the Clean Water Act." Oral Argument, Dec. 4, 2002 (emphasis added). But of course, if anything, this statement at least suggests that the Corps' interpretation of the 1977 regulations is different than that interpretation that the majority ascribes to the Corps and then defers to.

Rather than acknowledge that it actually has no idea how the Corps interprets the 1977 regulations, the majority goes outside the litigation in search of an interpretation to which to defer. But its search yields neither an interpretation nor competent evidence of the Corps' interpretation of these now-superceded regulations. The putative agency interpretation to which the court so eagerly defers is constructed by the majority almost entirely from statements made in the course of promulgation of, not the 1977 regulations in question, but rather, the 2002 joint Corps/EPA regulations.[1] These statements say nothing

---

[1]The majority also points to certain statements in the Federal Register regarding the "waste" exclusion in the 1977 regulation. Not only do the

more than that the 2002 regulations are consistent with the superceded EPA regulations and the agencies' regulatory *practice*. They also describe the agencies' vision of areas that are appropriate for section 404 regulation, but are quite careful not to say that the 1977 regulations covered those areas. Thus the statements on the basis of which the majority infers the Corps' interpretation say nothing at all about the agency's interpretation of the 1977 regulations, leaving it quite possible, as the Kentuckians contend, that the Corps' regulatory practice was inconsistent with its own 1977 regulations, (which prompted promulgation of the 2002 regulations) — a possibility not as much as considered by the majority.

Rather than "overlooking" the 1977 and 2000 statements by the Corps in the Federal Register, I have actually read those statements carefully, which I am not sure the majority has done. If it had, it would be clear to the majority as well that in neither place does the Corps "state its interpretation of the 1977 Regulation," *ante* at 31 n.3. This is my entire point, namely, that *nowhere* does the Corps state what its interpretation of the regulation is. The sleight of hand employed by the majority in footnote 3 is its equation of "practice" with "interpretation." In the 2000 and 2002 Federal Register statements, the Corps does describe its *practice* but it does not, despite the majority's assertion otherwise, state its *interpretation*. In the 1977 Federal Register it states neither.

In the absence of a stated interpretation, of course, the "additional approach" referenced by the majority in the same footnote is meaningless, because it is unknown whether the "Corps' regulatory practice reflects its interpretation," *ante* at 31 n.3. The only authority offered by the majority in support of its approach, *Udall* v. *Tallman*, is, in any event, inexplicable given that (even according to the majority) there was in that case a longstanding administrative *interpretation* of the two Executive Orders to which to defer.

I credit my colleagues with going the extra mile and reviewing the ten years of correspondence between the EPA and the Corps, *see ante*

---

quoted portions not speak to mountaintop overburden, which is what is at issue in this case, but they also do not address the primary purpose test established by the 1977 regulation.

at 28-29, in an effort to identify an agency interpretation of the regulation at issue. Of course, that through this exercise all it learns is that there has been a division of authority between the EPA and the Corps only confirms what has been the futility in its overall enterprise to divine an agency interpretation. For, the fact that the EPA and Corps have divided and shared authority bears not at all on the regulatory interpretation espoused by either, although the majority evidently believes otherwise. And this is not to mention that the block quote featured by the majority in conclusion is not even that of the Corps or a Corps official but rather a statement of an *EPA* official. *See ante* at 29.

Even if the Corps had interpreted the 1977 regulations as the majority believes it had, it is not clear that that interpretation is due any deference. As the majority correctly recites, the agency interpretation must not be "inconsistent with the text of the regulation." The 1977 regulations defined "fill material" as follows:

> any material *used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a[ ] waterbody*. The term does not include any pollutant discharged into the water primarily to dispose of waste, as that activity is regulated under section 402 of the Clean Water Act.

33 C.F.R. § 323.2(e) (2001) (emphasis added). While the majority asserts that the Corps' assumed interpretation is consistent with the term "waste" as used in the regulations, it completely fails to analyze whether that interpretation is consistent with the "primary purpose" test also established by the regulations. And how the deposit of mining spoil into waters of the United States for purposes of disposal has the *primary purpose* of creating dry land or elevating the waterbody is, at the very least, not immediately obvious.

None of the above is necessarily to disagree with the ultimate conclusions the majority reaches with respect to any of the issues it decides, although I do suspect that it might be incorrect as to one, if not more, of those conclusions. It is, however, to highlight the weakness in its analysis and thereby the perils that inhere in deciding issues that have not only not been briefed or argued by the parties, but have

not even been decided by the district court whose judgment we review.

Rather than embark on the treacherous course chosen by the district court and the majority to resolve all issues, regulatory and statutory, that are presented by the deposit of mountaintop fill in waters of the United States, I would confine myself to the narrow issue presented by the case.

As the parties readily acknowledged at argument, there was no need for the district court (and there is likewise no need for this court) to interpret the Clean Water Act, or the 2002 jointly-promulgated regulations. When asked by the court the following, "you don't believe that the district court was required to address the Clean Water Act at all, do you? You believe that this deposit of waste was invalid under the existing Corps rule," counsel for the Kentuckians replied "Correct." And counsel for the Corps similarly affirmed that "th[is] court doesn't need to get into the construction of the Clean Water Act." And I would say nothing about either.[2] I would address only those

---

[2]Contrary to the suggestion of my colleagues, I do not "assume[ ]" that the agency acted within the scope of its statutory authority. *Ante* at 21 n.2. Neither do I assume that the agency acted within the scope of its regulatory authority. Indeed, I have raised questions about whether the agency acted in compliance with its authority under *both* the regulation *and* the statute.

The paragraph in the Kentuckians' complaint cited by my colleagues for their assumption that the Kentuckians challenge both the regulation and the Clean Water Act does not at all convince me that the Kentuckians has done so; in fact I understand that paragraph, without more, and also the complaint as a whole, to challenge only the issuance of the permit under the regulations. It is only this understanding that can logically be reconciled with the Kentuckians' undisputed challenge to the Martin Coal permit only. The Kentuckians' argument is, quite simply, and has been from the outset, that the issuance of the Martin Coal permit violated both the regulation and the statute. The Kentuckians has never argued, as it orally affirmed before us, that the 1977 regulation is incompatible with section 404 of the Clean Water Act. Needless to say, that the district court decided the statutory question is of no moment to me because, as I have explained, the district court reached and decided every possible issue it could (except the only issue presented in the case), as does the majority.

claims presented by the Kentuckians in its complaint, and I would further limit myself to deciding only the subset of issues presented on appeal.

In this case, the sole issue on appeal is whether the district court's judgment and opinions, which confront issues not raised and grants relief no party requested, all the while failing to reach the one issue actually raised, were proper. Clearly, neither is. As a result, I would vacate the district court's entire injunction and its opinions and remand for consideration of the only issue that has ever been presented by these parties — the lawfulness of the Martin Coal permit under the Corps' 1977 regulations. If a new judge is not to be designated, the integrity of the judicial process requires at least that we wipe the slate clean, returning these parties to where they started, and require the district court in the first instance to decide the issue presented by the complaint — and only that issue — after which a decision on the merits of the dispute would be in order. As currently postured, the case is, to cast legalese aside in favor of clarity, upside-down. And no amount of disquisition undertaken from essentially the same procedural perspective of the district court can turn it upright — not even one, as the majority's, that arrives at conclusions diametrically opposite those reached by that court.