# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SOUTHEAST ALASKA CONSERVATION
COUNCIL; SIERRA CLUB; LYNN
CANAL CONSERVATION,
              *Plaintiffs-Appellants,*

              v.

UNITED STATES ARMY CORPS OF
ENGINEERS; TIMOTHY J. GALLAGHER,
Colonel, in his official capacity as
District Engineer; LARRY L.
REEDER, in his official capacity as
Chief of the Regulatory Branch;
DOMINIC IZZO, in his official
capacity as Principal Deputy
Assistant Secretary of the Army
(Civil Works); UNITED STATES
FOREST SERVICE,
              *Defendants-Appellees,*

COEUR ALASKA, INC.; GOLDBELT,
INC.; STATE OF ALASKA,
              *Defendants-Intervenors-*
                      *Appellees.*

No. 06-35679

D.C. No.
CV-05-00012-J-JKS

OPINION

Appeal from the United States District Court
for the District of Alaska
James K. Singleton, Senior District Judge, Presiding

Argued and Submitted
December 4, 2006—San Francisco, California

Filed May 22, 2007

Before: Procter Hug, Jr., A. Wallace Tashima, and
Susan P. Graber, Circuit Judges.

5959

Opinion by Judge Hug

**COUNSEL**

Thomas S. Waldo and Demian A. Schane, Earthjustice, Juneau, Alaska, for plaintiffs-appellants.

John T. Stahr and Mark A. Nitczynski, U.S. Department of Justice, Environment & Natural Resources Division, Washington, D.C., for defendants-appellees.

David J. Burman and Robert A. Maynard, Perkins Coie LLP, Boise, Idaho; John C. Berghoff, Jr., and Michael P. Rissman, Mayer Brown Rowe & Maw LLP, Chicago, Illinois; Cameron M. Leonard, State of Alaska, Department of Law, Fairbanks,

Alaska; and David C. Crosby, David C. Crosby PC, Juneau, Alaska, for defendants-intervenors-appellees.

Melissa Powers and Allison LaPlante, Pacific Environmental Advocacy Center, Portland, Oregon; Joseph M. Lovett, Appalachian Center for the Economy & the Environment, Lewisburg, West Virginia; and Peter Van Tuyan, Bessenyey & Van Tuyn, Anchorage, Alaska, for *amici curiae* in support of plaintiffs-appellants.

John W. Hartle, City and Borough of Juneau, Juneau, Alaska; Amy Gurton Mead, Robertson, Monagle & Eastaugh, Juneau, Alaska; Steven J. Lechner, Mountain States Legal Foundation, Lakewood, Colorado; Michael R. Shebelskie, Hunton & Williams LLP, Richmond, Virginia; Harold P. Quinn, Jr., National Mining Association, Washington, D.C.; and Stephen F. Sorensen, Simpson, Tillinghast & Sorensen PC, Juneau, Alaska, for *amici curiae* in support of defendants-appellees.

---

**OPINION**

HUG, Circuit Judge:

This case presents the question of whether the issuance of a permit by the U.S. Army Corps of Engineers violates the Clean Water Act.[1] The permit issued in this case authorizes Coeur Alaska, Inc., to discharge process wastewater containing tailings from its gold mine into a lake that is a navigable water of the United States. Coeur Alaska proposes to discharge daily 210,000 gallons of process wastewater containing 1,440 tons of tailings from its mine into Lower Slate Lake. The tailings in the discharge will raise the bottom elevation of the lake by 50 feet. A 90-foot high, 500-foot long dam will be built to contain the discharge and the area of the

---

[1]33 U.S.C. §§ 1251-1387.

lake will be increased about three-fold. The U.S. Army Corps of Engineers contends that the permit was properly granted under § 404 of the Clean Water Act, which relates to the disposal of "fill material," and that it is not subject to the effluent restrictions of § 301 or § 306 of the Clean Water Act. The plaintiffs contend that this mine disposal discharge must comply with the effluent restrictions of § 301 and § 306, and that any permit allowing discharge must be issued by the Environmental Protection Agency. The district court held that the issuance of the permit was proper. We reverse and remand with instructions to vacate the permit.[2]

I.

Coeur Alaska intends to open the Kensington Gold Mine on the site of a prior mine in southeast Alaska that operated from 1897 to 1928. Although the mining operation will include several above-ground facilities, the mine itself will be entirely subterranean.

To process the gold ore retrieved from the mine, Coeur Alaska will construct a froth-flotation mill facility. In the froth-flotation process, ore-bearing rock from the mine will be transported to a mill and moved through a series of mechanical crushing and grinding procedures. After the rock is finely ground, it will be fed into a tank where water and chemicals referred to as conditioners, frothers, surfactants, and scale inhibitors will be added. Air is then pumped into the tank, producing bubbles that attach to the gold deposits. The bubbles rise, bringing the gold with them and forming a froth that is skimmed off the top.

---

[2]We also vacate the permit granted to Goldbelt, Inc., to construct the Cascade Point Marine Facility in Berners Bay and the U.S. Forest Service's Record of Decision approving the general plan because they are dependent on the validity of the permit issued by the U.S. Army Corps of Engineers to Coeur Alaska.

After the gold has bubbled up to the surface and the froth is removed, the tailings — residual ground rock — remain as a waste product. Of the 2,000 tons of ore that the Kensington mine will process each day, only about 100 tons (5 percent) contain economically viable gold minerals. About 40 percent of the tailings will be used as backfill in the mine. The remaining volume is, according to Coeur Alaska, too large to transport off site and presents a waste disposal problem. This dispute arises from Coeur Alaska's current plan for addressing that disposal problem.

Coeur Alaska's earlier plan of operations for the Kensington Gold Mine called for the construction of a "dry tailings facility," in which the mine would dispose of waste from its froth-flotation mill on dry "uplands." This disposal process involved the construction of berm and drainage structures around the designated disposal area, dewatering the process wastewater, and placement of the tailings within an enclosure. After the closure of the mine in about 10 to 15 years, Coeur Alaska would have been required to cover the disposal area with native material to support revegetation. The U.S. Forest Service ("Forest Service") approved the plan of operations for the dry tailings facility, and the U.S. Army Corps of Engineers ("Corps") and the Environmental Protection Agency ("EPA") issued permits to the company authorizing the construction of this facility in 1997. The price of gold subsequently dropped to $400 an ounce, however, prompting Coeur Alaska to investigate less expensive ways to develop the mine project.[3] In 2004, Coeur Alaska proposed a new plan of operations with significant amendments. The most important change for our purposes was that, instead of the dry tailings facility, Coeur Alaska proposed to discharge its process wastewater containing the tailings directly into nearby Lower Slate Lake.

---

[3]The price of gold has since been rising steadily and is currently over $680 an ounce, thus the original motivation for the change in waste disposal from the mine no longer exists.

Lower Slate Lake, a 23-acre subalpine lake in the Tongass National Forest, is one of several small lakes in the vicinity of the mine. The lake is a fish and wildlife habitat and supports about 1,000 Dolly Varden Char (a freshwater fish) and other native fish and aquatic life. The lake is also a tributary of Slate Creek and drains into Berners Bay.

Coeur Alaska's current disposal plan involves piping approximately 210,000 gallons of process wastewater, including 1,440 tons of tailings, each day to the bottom of Lower Slate Lake in the form of a slurry. This slurry would consist of about 45 percent water and 55 percent tailings. A polymer and flocculent would be added to the slurry to enhance settling of the tailings. Over the 10- to 15-year life of the mine, approximately 4.5 million tons of tailings would be deposited into the lake. The discharge ultimately would raise the bottom of the lake 50 feet, to its current high water mark, and nearly triple its surface area. Coeur Alaska and the Corps admit that the discharge and settling of the tailings into the lake would kill all the fish and nearly all the aquatic life. The effluent would have a pH factor of over 10, which is considerably higher than the lake's current pH factor, and would contain concentrations of several potentially hazardous materials, including aluminum, copper, lead, and mercury. The toxicity of the discharge may have lasting effects on the lake and may negatively affect its ability to sustain aquatic life in the future. The Corps intends that aquatic life would be reintroduced into the lake, but the extent to which aquatic life could be restored eventually is unclear.

To prepare the lake for use as a wastewater disposal facility and the consequent expansion of the lake's surface, Coeur Alaska would construct a 90-foot high, 500-foot long dam at the lake's outfall point. Coeur Alaska's long-term plan to use the lake as a disposal facility also includes the construction of a diversion ditch. Constructing the ditch would require cutting trees on 7.6 acres of forested land, building a 30-foot wide road, excavating and digging a 3,000-foot ditch, and filling in

4.3 acres of nearby wetlands with 28,800 cubic yards of fill material. In addition, during the 10- to 15-year period of the lake's use as a disposal facility, Slate Creek would be diverted around the lake through a pipeline.

The Forest Service approved Coeur Alaska's current plan of operations at the Kensington Gold Mine, including the revised disposal plan, in a Record of Decision ("ROD") on December 9, 2004. Because the proposed discharge would have the effect of raising the bottom elevation of Lower Slate Lake, the Corps reasoned that the permit program under § 404 of the Clean Water Act, rather than § 402, applies to Coeur Alaska's planned discharges. Accordingly, the Corps issued a permit for the discharge into Lower Slate Lake on June 17, 2005.

Under the permit, when operations at the mine eventually cease, the Corps would require Coeur Alaska to mitigate the environmental impacts at the lake by installing a cap of native material over the tailings at the bottom of the lake. The Corps would also require Coeur Alaska to reintroduce native fish species into the lake and monitor the health of the ecosystem.

## II.

Southeast Alaska Conservation Council, the Sierra Club, and Lynn Canal Conservation (collectively "SEACC") filed this lawsuit challenging the Corps' permit and the Forest Service's ROD approving the general plan on the grounds that they violate § 301(a), § 301(e), and § 306(e) of the Clean Water Act. The crux of SEACC's argument is that the Corps violated the Clean Water Act by issuing a permit for the discharge of process wastewater from a froth-flotation mill into a body of water protected by the Clean Water Act.

After the complaint was filed, the Corps decided to suspend the permit and reconsidered its decision to issue the permit. For that purpose, the Corps moved for voluntary remand of

the case before briefing on the merits began, which the district court granted on November 14, 2005. The Corps reinstated the original permit, without changes, on March 29, 2006. At the same time, the Corps issued a revised ROD in which it explained its rationale. SEACC then filed an amended complaint, in which it reiterated its allegations and reasserted its causes of action. Coeur Alaska, Goldbelt, Inc., and the State of Alaska intervened as defendants. The parties filed cross-motions for summary judgment.

The district court granted summary judgment to the defendants on August 4, 2006. In its opinion, the district court focused on whether the Corps misapplied § 404 of the Clean Water Act. The district court noted that SEACC challenged the granting of the permit on the grounds that it did not comply with § 301(e) and § 306(e). It held that if the permit was issued under § 404 for the disposal of "fill material," then § 301(e) and § 306(e) were inapplicable.

SEACC appealed on August 7, 2006, three days after the district court's decision, and this court, on SEACC's motion, granted an injunction pending appeal on August 24, 2006, which prohibited Coeur Alaska, the Corps, and the Forest Service from proceeding with further construction activities related to preparing the lake for use as a waste disposal site. *See SEACC v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1099 (9th Cir. 2006). Since granting the injunction, we have addressed two emergency motions related to stabilizing a temporary coffer dam that was hastily constructed by Coeur Alaska prior to the injunction. *Id.*; *SEACC v. U.S. Army Corps of Eng'rs*, 479 F.3d 1148, 1151-52 (9th Cir. 2007).

III.

We review the district court's grant of summary judgment de novo and must determine whether the district court correctly applied the relevant substantive law. *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d

969, 973 (9th Cir. 2003); *United States v. City of Tacoma*, 332 F.3d 574, 578 (9th Cir. 2003). "De novo review of a district court judgment concerning a decision of an administrative agency means the court views the case from the same position as the district court." *Turtle Island*, 340 F.3d at 973 (citing *Nev. Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993)). Judicial review of administrative decisions under the Clean Water Act is governed by § 706 of the Administrative Procedure Act ("APA"). *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1170 (9th Cir. 2004). Under the APA, a court may set aside an agency action if the court determines that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Turtle Island*, 340 F.3d at 973.

## IV.

Two different regulations contain plain language interpreting the Clean Water Act that would appear to govern Coeur Alaska's proposed plan of operations at the Kensington Gold Mine, but they result in different interpretations of the Act. The discharge of wastewater containing tailings from Coeur Alaska's froth-flotation mill operation facially meets the Corps' current regulatory definition of "fill material" because it would have the effect of raising the bottom elevation of the lake. *See* 33 C.F.R. § 323.2(e). Accordingly, under this interpretation, the discharge would be subject to the permit process governed by § 404 of the Clean Water Act. However, EPA previously promulgated a performance standard, pursuant to § 301 and § 306 of the Clean Water Act, that prohibits discharges from froth-flotation mills into waters of the United States. *See* 40 C.F.R. § 440.104(b)(1).

Both of the regulations appear to apply in this case, yet they are at odds. As explained below, the plain language of the Clean Water Act resolves this conflict and requires that the performance standard controls. The statute is unambiguous on

this point, and the performance standard applies to discharges from the froth-flotation mill at Coeur Alaska's Kensington Gold Mine into Lower Slate Lake. Furthermore, the federal agencies' clear statements at the time they adopted the current regulatory definition of the term "fill material" demonstrate that they did not intend for waste products subject to effluent limitations and performance standards to be regulated as "fill material." For these reasons the Corps should not have issued a permit to Coeur Alaska under § 404. The district court's grant of summary judgment in favor of the Corps is reversed, and we remand for summary judgment to be entered in favor of the plaintiffs with directions to vacate the permit granted by the Corps.

## A.

We begin, as we must, with the text of the Clean Water Act itself to determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.* at 843 n.9.

## 1.

Congress passed the Clean Water Act in 1972 "to restore and maintain the chemical, physical, and biological integrity" of the waters of the United States. 33 U.S.C. § 1251(a). To achieve this objective, the Clean Water Act sought to eliminate completely the discharge of all pollutants into the nation's navigable waters by 1985. 33 U.S.C. § 1251(a)(1). It also sought to make those waters suitable for fish, shellfish, wildlife, and recreation. 33 U.S.C. § 1251(a)(2). One of Con-

gress's principal concerns in passing the Clean Water Act was the use of water for waste disposal, which Congress deemed "unacceptable." *See* S. Rep. No. 92-414, at 7 (1971), *reprinted in* 1971 U.S.C.C.A.N. 3668, 3674 ("The use of any river, lake, stream or ocean as a waste treatment system is unacceptable."), *quoted in Weyerhauser Co. v. Costle*, 590 F.2d 1011, 1043 (9th Cir. 1978).

**[1]** The "cornerstone" and "fundamental premise" of the Clean Water Act is § 301, which prohibits all discharges of any pollutant except in compliance with specified provisions of the statute. *Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1009 (9th Cir. 2002); *Natural Res. Def. Council, Inc. v. EPA*, 822 F.2d 104, 109 (D.C. Cir. 1987). Specifically, § 301(a) provides that "the discharge of any pollutant by any person shall be unlawful" except when the discharge complies with the requirements of, *inter alia*, § 301, § 306, § 402, *and* § 404.[4] 33 U.S.C. § 1311(a). In furtherance of this mandate, § 301(b) requires EPA to adopt increasingly stringent, technology-based effluent limitations[5] for point sources.[6] Once an effluent limitation is promulgated, § 301(e) requires that it "shall be applied to *all* point sources of discharge of pollutants in accordance with the provisions of" the statute. 33 U.S.C. § 1311(e) (emphasis added).

---

[4]The full text of § 301 states: "Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a).

[5]"The term 'effluent limitation' means any restriction established by a State or the [EPA] on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, . . . including schedules of compliance." 33 U.S.C. § 1362(11).

[6]"The term 'point source' means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

**[2]** Similarly, § 306 requires EPA to implement even more stringent "standards of performance" for new sources such as the new Coeur Alaska mine project.[7] 33 U.S.C. §1316(b). To carry out § 306's directive, EPA must promulgate a list of categories of sources and, for new sources within each category, establish a national standard of performance (also referred to as a New Source Performance Standard). *Id.* A standard of performance is defined as "a standard for the control of the discharge of pollutants which reflects the greatest degree of effluent reduction which [EPA] determines to be achievable through application of the best available demonstrated control technology, processes, operating methods, or other alternatives, including, where practicable, a standard permitting *no discharge* of pollutants." 33 U.S.C. § 1316(a)(1) (emphasis added). As with the effluent reductions promulgated under § 301,[8] § 306 states that, once a standard of performance takes effect, "it shall be unlawful for any owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source." 33 U.S.C. § 1316(e). Congress thus "intended these regulations to be absolute prohibitions." *E.I. du Pont de Nemours & Co. v. Train ("Du Pont")*, 430 U.S. 112, 138 (1977) (citing S. Rep. No. 92-414, at 58 (1971)). The legislative history of § 306 indicates that Congress made a "deliberate choice not to allow variances for new sources." *Riverkeeper, Inc. v. EPA*, 358 F.3d 174, 192 (2d Cir. 2004). As such, no exceptions to a

---

[7]"The term 'new source' means any source, the construction of which is commenced after the publication of proposed regulations prescribing a standard of performance under this section which will be applicable to such source, if such standard is thereafter promulgated in accordance with this section." 33 U.S.C. § 1316(a)(2).

"The term 'source' means any building, structure, facility, or installation from which there is or may be the discharge of pollutants." 33 U.S.C. § 1316(a)(3).

[8]A standard of performance is one type of effluent limitation. *See* 33 U.S.C. § 1362(11). Therefore, § 301(e) and § 306(e) have the same practical effect in this case.

standard of performance are allowed. *See id.*; *Du Pont*, 430 U.S. at 138.

**[3]** To ensure compliance with effluent limitations and performance standards established pursuant to § 301 and § 306, Congress created the National Pollutant Discharge Elimination System ("NPDES") permit program under § 402 of the Act. Through the NPDES program, EPA may permit a discharge, but only if it complies with § 301 and § 306. Additionally, NPDES permits are supposed to limit the release of pollutants into waterways as much as possible by imposing numerical discharge restrictions. *Rybacheck v. EPA*, 904 F.2d 1276, 1283 (9th Cir. 1990). For this reason, the NPDES permit program is considered "central to the enforcement" of the Clean Water Act. *Natural Res. Def. Council, Inc. v. Costle*, 568 F.2d 1369, 1374 (D.C. Cir. 1977).

**[4]** In addition to the NPDES permit program, the Clean Water Act established a secondary permit program for the discharge of "dredged or fill material" under § 404. According to § 404, the Corps "may issue permits . . . for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). We conclude that the permit scheme under § 404 is a limited permit program that applies only to dredged or fill material, not to the discharge of pollutants from industrial or municipal sources.

2.

**[5]** The language of the Clean Water Act is clear on the issue at the center of this dispute. First, § 301(a) prohibits *any* discharge that does not comply with several enumerated sections, including both § 301 and § 306, as well as § 402 and § 404. 33 U.S.C. § 1311(a). The use of "and" as a connector, instead of "or," indicates that Congress intended for effluent limitations and standards of performance to apply to all applicable discharges, even those that facially qualify for permitting under § 404. Second, § 301(e) applies effluent limitations

established by EPA to *all* discharges. 33 U.S.C. § 1311(e). Third, § 306(e) prohibits *any* discharge that does not comply with performance standards promulgated by EPA. 33 U.S.C. § 1316(e). In clear and precise terms, § 301 and § 306 require that discharges comply with applicable effluent limitations and standards of performance. Neither § 301 nor § 306 contains an exception for discharges that would otherwise qualify for regulation under § 404. Rather, § 301 and § 306 are "absolute prohibitions" with no exceptions. *Du Pont*, 430 U.S. at 138.

**[6]** Nevertheless, the defendants argue that § 301 and § 306 do not apply to § 404 permits because § 402 explicitly requires compliance with those sections whereas § 404 does not. The defendants then reason, by way of negative inference, that § 404 contains an implied exception to the requirements of § 301 and § 306 whenever a proposed discharge would meet the agencies' regulatory definition of "fill material." We disagree. Negative inferences and implied exceptions are generally disfavored. As the Supreme Court stated in *United States v. Rutherford*, 442 U.S. 544 (1979): "Exceptions to clearly delineated statutes will be implied only where essential to prevent 'absurd results' or consequences obviously at variance with the policy of the enactment as a whole." *Id*. at 552 (citing *Helvering v. Hammel*, 311 U.S. 504, 510-11 (1941)). That is because courts have "generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" of particular language. *S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, 126 S. Ct. 1843, 1852 (2006) (quoting *Bates v. United States*, 522 U.S. 23, 29-30 (1997)). The defendants have produced no compelling reason to believe that Congress intended an exception within § 404 that it did not explicitly create. If the defendants' interpretation were correct, Congress would have written § 301 and § 306 within § 402, not as separate sections. Moreover, the implied exception urged by the defendants, if adopted, would turn § 404 into an exception that swallows the rule created by § 301, § 306, and § 402 by allowing the Corps to use a nega-

tive inference from an exception clause within § 402. Thus, § 404's silence regarding the explicit and detailed requirements in § 301 and § 306 cannot create an exception to those sections' strongly-worded blanket prohibitions.

The defendants' interpretation would render § 301(e) and § 306(e) effectively meaningless. Courts strive to avoid interpreting a statute "in a manner that renders other provisions of the same statute inconsistent, meaningless, or superfluous." *Boise Cascade Corp. v. EPA*, 942 F.2d 1427, 1432 (9th Cir. 1991), *quoted in Cuevas-Gaspar v. Gonzales*, 430 F.3d 1013, 1024 (9th Cir. 2005); *see also Ratzlaf v. United States*, 510 U.S. 135, 140-41 (1994); *Watt v. Alaska*, 451 U.S. 259, 267 (1981) ("We must read the statutes to give effect to each if we can do so while preserving their sense and purpose."). If the defendants were correct, the words "all" in § 301(e) and "any" in § 306(e)[9] would lose their meaning entirely.

**[7]** There is a much simpler explanation for the difference in language between § 402 and § 404 than the defendants' proposed negative inference. If EPA has adopted an effluent limitation or performance standard applicable to a relevant source of pollution, § 301 and § 306 preclude the use of a § 404 permit scheme for that discharge. *See* 67 Fed. Reg. 31,129, 31,135 (May 9, 2002); EPA/Corps, Joint Response to Comments 12 (May 3, 2002). Accordingly, the NPDES program administered by EPA under § 402 is the only appropriate permitting mechanism for discharges subject to an effluent

---

[9]Section 301(e) provides: "Effluent limitations established pursuant to this section or section 1312 of this title shall be applied to *all* point sources of discharge of pollutants in accordance with the provisions of this chapter." 33 U.S.C. § 1311(e) (emphasis added).

Section 306(e), which applies to new sources like the Coeur Alaska mine project, provides: "After the effective date of standards of performance promulgated under this section, it shall be unlawful for *any* owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source." 33 U.S.C. § 1316 (emphasis added).

limitation under § 301 or a standard of performance under § 306. Consequently, there was simply no need for Congress to enumerate § 301 or § 306 within § 404 because Congress never intended for § 404 to govern discharges subject to effluent limitations or performance standards. Rather, when a discharge is subject to an effluent limitation or performance standard, that discharge must comply with the NPDES program as required by § 402. *See* 67 Fed. Reg. at 31,135; 47 Fed. Reg. 54,598, 54,606 (Dec. 12, 1982). This construction of the statute preserves the full meaning of all of its provisions without rendering any provision superfluous or resorting to negative inferences and implied exceptions.

Additionally, although § 404 does not contain an explicit exception to effluent limitations or standards of performance, it does contain exceptions to other provisions of the Clean Water Act. Specifically, § 404(f) exempts discharges of dredged or fill material from certain activities from regulation under § 301(a), § 402, and § 404. 33 U.S.C. § 1344(f)(1). Discharges related to agricultural activities and road construction, among others, are exempted under § 404(f)(1). Mining is not listed as an exempt activity. "Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980). The defendants have produced no reason to believe that Congress intended additional exemptions to be created later. Therefore, the lack of any explicit exception to § 301 and § 306 within § 404, and the lack of an exception for process wastewater from mines, is strong evidence that Congress did not intend one. *Id.* Even stronger evidence is Congress's insistence in § 404(f) that even the discharges from the enumerated activities continue to be subject to effluent standards. 33 U.S.C. § 1344(f).

**[8]** Thus, the plain language of the Clean Water Act directly resolves the conflict between the regulatory definition of "fill material" and EPA's performance standard for froth-

flotation mill operations. Pursuant to § 301 and § 306, EPA's performance standard for froth-flotation mills governs this situation. The language of § 404 does not lead to a contrary conclusion.

B.

Although the plain language of the Clean Water Act resolves the apparent regulatory conflict at the heart of this case, the regulatory history further demonstrates that neither the Corps nor EPA intended for the current regulatory definition of "fill material" to replace the performance standard for froth-flotation mills. Courts consider contemporaneous explanations of regulations, such as those published in the Federal Register through notice-and-comment rulemaking, in order to determine an agency's intent. *See Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 714-16 (1985); *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 797 (9th Cir. 2003); *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1189-90 (9th Cir. 2002); *Kentuckians for the Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425, 446-47 (4th Cir. 2003). And courts will not defer to an agency's interpretation of a regulation that contradicts the agency's intent at the time it promulgated the regulation. *Gonzales v. Oregon*, 546 U.S. 243, 126 S. Ct. 904, 916 (2006); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *Alaska Trojan P'ship v. Gutierrez*, 425 F.3d 620, 627-28 (9th Cir. 2005); *see also Auer v. Robbins*, 519 U.S. 452, 461 (1997) (an agency's interpretation of a regulation is not entitled to deference where it is "plainly erroneous" or "inconsistent with the regulation") (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)). When the agencies promulgated the current definition in 2002, they foresaw and specifically addressed the potential conflict between the effects-based definition of "fill material" and performance standards already in place. To that end, the agencies explicitly stated that wastes subject to performance standards and effluent limitations would not be considered "fill materi-

al." The Corps' application of the fill rule in this case, therefore, contradicts its interpretation at the time the regulation was promulgated.

1.

Following its statutory obligation under § 301 and § 306, in 1982 EPA promulgated effluent limitations and standards of performance for sources within the category of ore mining. *See* 47 Fed. Reg. 25,682 (June 14, 1982) (proposed); 47 Fed. Reg. 54,598 (Dec. 3, 1982) (final). Within this category, EPA established a subcategory that applied to gold mining. *See* 40 C.F.R. §§ 440.100-440.104. For gold mines using the froth-flotation mill process, EPA promulgated a zero-discharge standard:

> Except as provided in paragraph (b)[2] of this section, there shall be *no discharge* of process wastewater to navigable waters from mills that use the froth-flotation process alone, or in conjunction with other processes, for the beneficiation of copper, lead, zinc, gold, silver, or molybdenum ores or any combination of these ores.

40 C.F.R. § 440.104(b)(1) (emphasis added); *see also* 47 Fed. Reg. at 25,697 (proposing zero discharge). EPA found that the zero-discharge standard was practicable because the majority of facilities existing at the time already achieved zero discharge through recycling and evaporation processes. 47 Fed. Reg. at 54,602. EPA promulgated this standard knowing that process wastewater discharges from froth-flotation mills contain a large amount of suspended solids that could otherwise qualify for regulation under § 404 pursuant to its effects-based definition of "fill material." *See* 47 Fed. Reg. at 25,685 ("Mill process wastewater is characterized by very high suspended solids levels (often in the percent range rather than milligrams per liter) . . . ."). In determining that a strict zero-discharge limit was appropriate, EPA determined that the best

available control technology included the complete recycling of process wastewater. *See* 47 Fed. Reg. at 54,602. Given that the regulation facially applies to *any* discharge from a froth-flotation mill, and that it provides some limited exceptions that do not include "fill material," EPA intended for the prohibition to apply to discharges that would otherwise qualify as fill material under § 404. *See* 67 Fed. Reg. at 31,135. This conclusion is also supported by the fact that EPA promulgated the regulation notwithstanding its definition of "fill material," which was identical to the definition used by both agencies today.

2.

**[9]** The history of the current fill rule also demonstrates that both agencies intended for effluent limitations and performance standards to apply even to discharges that facially meet the definition of the term "fill material." The Clean Water Act does not define the term "fill material." Instead, Congress implicitly left that term to the Corps and EPA to define. *See Res. Invs., Inc. v. U.S. Army Corps of Eng'rs*, 151 F.3d 1162, 1166 (9th Cir. 1998). As with most regulatory definitions, the agencies' definitions of "fill material" have evolved over time. In fact, prior to the current regulatory definition of "fill material," the Corps and EPA defined "fill material" differently. The Corps initially used an effects-based test, which defined "fill material" as "any pollutant used to create fill in the traditional sense of replacing an aquatic area with dry land or of changing the bottom elevation of a water body for any purpose." 40 Fed. Reg. 31,320, 31,325 (July 25, 1975). EPA later adopted the identical definition. 40 Fed. Reg. 41,292, 41,298 (Sept. 5, 1975). Two years later, the Corps revised its definition and adopted a purpose-based test, which excluded from its definition "any pollutant discharged into the water primarily to dispose of waste." 42 Fed. Reg. 37,122, 37,145 (July 19, 1977). In adopting its purpose-based definition, the Corps explained that there were many waste materials "which technically fit within our definition of 'fill material' but which

were intended to be regulated under the NPDES program." *Id.* at 37,130. EPA, in 1980, chose to keep its effects-based test. *See* 45 Fed. Reg. 33,290, 33,421 (May 19, 1980).

The agencies' differing definitions of "fill material" created a potential regulatory overlap. *See, e.g., Res. Invs.*, 151 F.3d at 1165-66, 1168-69 (acknowledging overlap); *Kentuckians*, 317 F.3d at 432 ("the Corps acknowledged that the differing approaches in defining 'fill material' employed by EPA and the Corps in their regulations had created some uncertainty about their interpretation of the Clean Water Act"). Many industrial wastes contain a high proportion of suspended solids and, therefore, have the effect of changing the bottom elevation of a body of water. As such, those wastes could have been considered fill material under EPA's definition. However, EPA continued to regulate many of those industrial wastes under § 402, and also continued to promulgate new effluent limitations and standards of performance for industrial pollutants with high concentrations of solids, regardless of their potential to raise the bottom elevation of a body of water. *See, e.g.*, 46 Fed. Reg. 8,260, 8,292 (Jan. 26, 1981) (regulating discharges of suspended solids from log-washing processes). Indeed, the new source performance standard for froth-flotation mills was adopted in 1982, despite the fact that waste from this process would have the effect of raising bottom elevation and, therefore, could otherwise constitute fill material under EPA's effects-based test. *See* 47 Fed. Reg. at 25,685. Thus, notwithstanding the potential regulatory overlap created by the agencies' differing definitions, EPA regulated many industrial pollutants under § 402. The agencies formally adopted this practice in a Memorandum of Agreement on Solid Waste ("MOA") in 1986. 51 Fed. Reg. 8,871 (Mar. 14, 1986). After adoption of the MOA in 1986, the Corps continually declined to exercise jurisdiction over mine tailings.[10]

---

[10]*See, e.g.,* Memorandum from Col. John W. Pierce, U.S. Army Corps of Eng'rs, "Agency Jurisdiction over Certain Activities Connected with

In 2002, the agencies promulgated their joint regulation defining the terms "fill material" and "discharge of fill material." 67 Fed. Reg. at 31,130. The current regulatory definition of "fill material" provides:

> (1)   Except as specified in paragraph (e)(3) of this section, the term "fill material" means material placed in waters of the United States where the material has the effect of:
>
> > (i)   Replacing any portion of a water of the United States with dry land; or
> >
> > (ii)   Changing the bottom elevation of any portion of a water of the United States.
>
> (2)   Examples of such fill material include, but are not limited to: rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining[11] or other excavation activities, and materials used to create any structure or infrastructure in the waters of the United States.
>
> (3)   The term fill material does not include trash or garbage.

33 C.F.R. § 323.2(e) (Corps' regulation); 40 C.F.R. § 232.2

---

Mineral Extraction, Specifically Gold Mining, in Alaska" 1-2 (Apr. 14, 1992) ("The tailings behind the dam, however, are a waste product of the mining operation and are not under our jurisdiction according to the 1986 Memorandum of Agreement . . . ."); Letter from Glen E. Justis, U.S. Army Corps of Eng'rs 2-3 (June 18, 1991) ("The Corps has neither special expertise [n]or jurisdiction by law to evaluate the impacts of the tailings discharge. . . . The tailings do not meet the Corps' definition of fill material.").

[11]"Overburden" is generally defined as rock or soil cleared away before mining. *See* EPA, *Terms of Environment*, http://www.epa.gov/OCEPAterms/oterms.html (May 14, 2007).

(EPA's regulation) (emphasis added). The agencies also defined "discharge of fill material" as follows:

> The term "discharge of fill material" means the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: . . . placement of overburden, slurry, or tailings or similar mining-related materials
> . . . .

33 C.F.R. § 323.2(f); 40 C.F.R. § 232.2.[12]

At the same time, however, the agencies made clear that they did not intend to change their long-standing practice, according to which EPA regulates discharges of pollutants for which it has established effluent limitations or standards of performance under the NPDES program.[13]

> [W]e emphasize that today's rule generally is

---

[12]The *amici* brief of 14 members of Congress argues persuasively that the adoption of these regulations by the Corps and EPA violates the purposes and plain language of the Clean Water Act by allowing waste material to be dumped into lakes, rivers, and other waters of the United States. SEACC bases its argument on a narrower ground pertaining to this particular mine. Thus, we do not reach the issue of the validity of these regulations.

[13]In *Kentuckians*, the Fourth Circuit recognized the Corps' prior practice of not regulating discharges subject to effluent limitations under § 404:

> [W]e conclude that the Corps' interpretation of "fill material" as used in § 404 of the Clean Water Act to mean all material that displaces water or changes the bottom elevation of a water body *except* for "waste" — meaning garbage, sewage, and *effluent that could be regulated by ongoing effluent limitations* as described in § 402 — is a permissible construction of § 404.

317 F.3d at 448. The court also explained the Corps' prior position that it was not authorized to regulate discharges subject to effluent limitations. *Id.* at 445.

intended to maintain our existing approach to regulating pollutants under either section 402 or 404 of the CWA. Effluent limitation guidelines and new source performance standards ("effluent guidelines") promulgated under section 304[14] and 306 of the CWA establish limitations and standards for specified wastestreams from industrial categories, and those limitations and standards are incorporated into permits issued under section 402 of the Act. EPA has never sought to regulate fill material under effluent guidelines. Rather, effluent guidelines restrict discharges of pollutants from identified wastestreams based upon the pollutant reduction capabilities of available treatment technologies. Recognizing that some discharges (such as suspended or settleable solids) can have the associated effect, over time, of raising the bottom elevation of a water due to settling of waterborne pollutants, we do not consider such pollutants to be "fill material," and nothing in today's rule changes that view. *Nor does today's rule change any determination we have made regarding discharges that are subject to an effluent limitation guideline and standards, which will continue to be regulated under section 402 of the CWA.* Similarly, this rule does not alter the manner in which water quality standards currently apply under the section 402 or the section 404 programs.

67 Fed. Reg. at 31,135 (emphasis added). Additionally, in their Joint Response to Comments to the proposed rule, the agencies restated this position:

Under today's rule, we will continue, consistent with

---

[14]Sections 304 and 301 are interchangeable in this instance. Section 304 directs EPA in how to determine the degree of effluent reduction attainable under § 301. *Citizens Coal Council v. EPA*, 447 F.3d 879, 883 (6th Cir. 2006) (en banc) (citing 33 U.S.C. § 1314).

> our long-standing practice, to rely on the existence
> of effluent limitation guidelines or standards or a
> NPDES permit to inform the determination of how
> a particular discharge is regulated under the Act. If
> a specific discharge is regulated under Section 402,
> it would not also be regulated under Section 404, and
> vice versa.

EPA/Corps, Joint Response to Comments 30. In the same document, the agencies clarified that the new rule would not expand the jurisdiction of the Corps or permit previously prohibited discharges: "the suggestion that this rulemaking now provides a legal basis for previously illegal activities is not the case — no discharges that were previously prohibited are now authorized as a result of this rulemaking." *Id.* Thus, the agencies clearly intended to exclude discharges subject to effluent limitations or performance standards from the new definition of "fill material."

In fact, when the Corps and EPA first proposed the revised, coordinated definition in 2000, they included an explicit exemption from the definition of "fill material" for discharges subject to effluent limitations or standards of performance. *See* 65 Fed. Reg. 21,292, 21,299 (Apr. 20, 2000). The stated purpose of the exemption was to maintain the agencies' "current practice," which was "consistent with paragraph B.5 of the 1986 Solid Waste MOA." *Id.* at 21,297. Although the agencies removed the explicit exemption from the final rule, they did so only because commenters expressed concern that the exception was vague and would create uncertainty regarding whether the reference to effluent guidelines applied prospectively or only to those guidelines already in existence at the time. *See* 67 Fed. Reg. at 31,135. As such, the agencies still intended to regulate discharges subject to effluent limitations and standards of performance under § 402.

The defendants attempt to undermine the clear intent of the agencies by focusing on a single sentence of the preamble in

which the agencies stated "mining-related material that has the effect of fill when discharged will be regulated as 'fill material.' " *Id.* The district court also relied on that one sentence. However, the defendants and the district court give far more weight to that singular statement than it deserves. It is difficult to understand why the agencies would painstakingly explain in the preamble that the new definition would not change their treatment of discharges subject to effluent limitations and standards of performance, only to completely contradict themselves two paragraphs later. The agencies themselves cleared up any potential confusion in their Joint Response to Comments:

> Today's final rule clarifies that any material that has the effect of fill is regulated under section 404 and further that the placement of "overburden, slurry, or tailings or similar mining-related materials" is considered a discharge of fill material. *Nevertheless, if EPA has previously determined that certain materials are subject to an [effluent limitation guideline] under specific circumstances, then that determination remains valid.*

EPA/Corps, Joint Response to Comments 12. Thus, the current fill rule only applies to those tailings and other mining-related materials that are not subject to effluent limitations or standards of performance.[15] The agencies could not have been

---

[15]The Fourth Circuit's holding in *Kentuckians* is consistent with our conclusion. In *Kentuckians*, the court addressed the issue of whether the Corps had authority under § 404 to permit valley fills from mountain-top coal mining "when the valley fills serve no purpose other than to dispose of excess overburden from the mining activity." 317 F.3d at 439. EPA had not promulgated a performance standard for mountain-top coal mining, so neither § 301 nor § 306 was implicated in that case. *Id.* at 445. Moreover, in that case, the Corps admitted that, under the 2002 definition, "it was authorized to regulate discharges of fill, even for waste, *unless the fill amounted to effluent that could be subjected to effluent limitations*." *Id.* (emphasis added).

more clear in articulating that this would be their preferred approach.

### 3.

**[10]** In fact, the agencies followed that approach with Coeur Alaska for quite some time. The Corps consistently informed Coeur Alaska that discharges from its froth-flotation mill would not be regulated as fill material under § 404. At least, the agencies took that approach up until the time that the Corps granted the permit that led to this dispute. Prior to the promulgation of the current fill rule in 2002, the Corps relied on the 1986 MOA in informing Coeur Alaska that it lacked jurisdiction and expertise to permit discharges of tailings from the Kensington mine as "fill material." For example, in a 1998 ROD, the Corps made clear to Coeur Alaska that it "does not regulate the placement of tailings." U.S. Army Corps of Eng'rs, ROD 13 (Jan. 18, 1998). And as late as 2005, EPA informed Coeur Alaska that "[b]ecause this project would be a new source, the New Source Performance Standards (NSPS) for gold mines and mills are applicable to the project." EPA, ROD for § 402 NPDES Permit 3 (June 28, 2005) (citing 40 C.F.R. § 440.104). Therefore, in addition to the regulatory history, the agencies have an established record of refusing to regulate tailings discharged from Coeur Alaska's planned froth-flotation mill at the Kensington mine as fill material under § 404.

### C.

The agencies' unequivocal statements regarding their intent not to override effluent limitations and standards of performance when they promulgated the current fill rule are dispositive and compel the conclusion that the Corps overstepped its authority in issuing a permit to Coeur Alaska under § 404. If the agencies actually did intend to repeal or create an exception to the performance standard for froth-flotation mills when they promulgated the current fill rule, they did not acknowl-

edge or provide a satisfactory explanation for the change in course. When an agency decides to change course by rescinding or changing a rule, the agency "is obligated to supply a reasoned analysis for the change." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). If an agency fails to comply with that obligation, the new rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and is invalid under § 706(2)(A) of the APA. *Id.* at 41 (citing 5 U.S.C. § 706(2)(A)); *see also Bush-Quayle '92 Primary Comm., Inc. v. Fed. Election Comm'n*, 104 F.3d 448, 453 (D.C. Cir. 1997). Not only did the Corps and EPA not acknowledge a change in course when they promulgated the fill rule, they actually stated the opposite intent. That is, the agencies made clear that effluent limitations and standards of performance would continue to apply. We could not have interpreted the fill rule as creating an exception to the performance standard for froth-flotation mills without the agencies complying with the APA by explaining their intent in the Federal Register and offering an opportunity for notice and comment. *See Motor Vehicle Mfrs.*, 463 U.S. at 42.

## D.

Finally, the performance standard governs because it is more specific. It is a basic principle of regulatory interpretation that a regulation dealing with a "narrow, precise, and specific subject is not submerged" by a later enacted regulation "covering a more generalized spectrum." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976), *cited in Cal. ex rel. Sacramento Metro. Air Quality Mgmt. Dist. v. United States*, 215 F.3d 1005, 1013 (9th Cir. 2000). Unlike the fill rule, which pertains to fill material generally, the performance standard covers froth-flotation mills precisely. *See* 40 C.F.R. § 440.104. Consequently, the agencies' later promulgation of the more general fill rule cannot supersede the narrow, precise, and specific performance standard for froth-flotation mills.

### E.

The Corps also issued a permit to Goldbelt, Inc., for construction of a marine terminal facility at Cascade Point and issued a ROD approving Goldbelt's plan of operations. *See* U.S. Army Corps of Eng'rs, Permit to Goldbelt, Inc. (July 15, 2005); U.S. Army Corps of Eng'rs, Revised ROD 4 (Mar. 29, 2006). Goldbelt's permit and ROD are predicated on a mine design of which a critical component is Coeur Alaska's discharge of process wastewater into Lower Slate Lake. But for that mine design, the Cascade Point facility would be unnecessary. In fact, the Corps itself stated that "without Kensington mine, the Cascade Point facility would not be constructed in the foreseeable future." U.S. Army Corps of Eng'rs, Revised ROD 4. For that reason, the Corps considered the terminal a "component" of the Kensington project and analyzed the terminal proposal in the same Final Supplemental Environmental Impact Statement and Revised ROD as the Kensington project. *Id.* Indeed, Goldbelt must have had a "significantly protectable interest" relating to the subject of this case in order to intervene as a defendant, which it chose to do. *United States v. City of L.A.*, 288 F.3d 391, 398 (9th Cir. 2002); Fed. R. Civ. P. 24(a)(2). Importantly, in its motion to intervene, the company admitted that "Goldbelt's Cascade Point marine terminal is an integral part of the approved Plan of Operations, and may be constructed and used *solely* to service the Kensington Mine as contemplated in that Plan of Operations." Goldbelt further admitted that "[a]ny ruling by this Court that delays or disrupts construction of the mine will leave Goldbelt with a 'permitted' facility that either it cannot build or cannot be operated once built because the condition precedent of Goldbelt's permits is construction and operation of the Kensington Mine as contemplated in the challenged Plan of Operations." Consequently, Goldbelt's permit and ROD are critically premised on Coeur Alaska's § 404 permit. Because that permit is invalid, the Corps' permit and ROD for the Cascade Point facility should be vacated.

### F.

**[11]** Under the APA, the normal remedy for an unlawful agency action is to "set aside" the action. 5 U.S.C. § 706(2). In other words, a court should "vacate the agency's action and remand to the agency to act in compliance with its statutory obligations." *Defenders of Wildlife v. EPA*, 420 F.3d 946, 978 (9th Cir. 2005), *cert. granted*, 127 S. Ct. 853 (2007); *see also Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001). For the reasons discussed above, the Corps' permit for the discharge of process wastewater from the froth-flotation mill at the Kensington Gold Mine into Lower Slate Lake violates § 301 and § 306 of the Clean Water Act. The Corps' permit for construction of a marine terminal at Cascade Point critically depends on the unlawful permit to Coeur Alaska. Consequently, we remand to the district court to vacate both permits, as well as the RODs on which they are based.

### V.

In conclusion, we reverse the district court, remand to the district court to vacate the permits issued to Coeur Alaska and Goldbelt, and vacate the RODs that approved Coeur Alaska's and Goldbelt's plans of operations. The Corps violated the Clean Water Act by issuing a permit to Coeur Alaska for discharges of slurry from the froth-flotation mill at the Kensington Gold Mine. EPA's performance standard for froth-flotation mills, promulgated pursuant to § 301 and § 306 of the Clean Water Act, prohibits discharges from such operations into the navigable waters of the United States. No exceptions are provided by either the regulation or the statute. Even though the discharge in this case facially qualifies for the permitting scheme under § 404 of the Clean Water Act because it will change the bottom elevation of Lower Slate Lake, the discharge is nevertheless prohibited by the clearly applicable and specific performance standard. The plain language and structure of the Clean Water Act demonstrate that

EPA's performance standard governs in this case. Also, the agencies' statements made during promulgation of the regulation defining "fill material," as well as their statements made to Coeur Alaska during the lengthy permitting process, indicate that they intended this result. Thus, the district court erred in granting summary judgment in favor of the defendants. The case is remanded to the district court for action pursuant to this opinion.

**REVERSED and REMANDED.**